Argued January 29, decided March 3, 1908.

# WATTS *v.* SPENCER.

[94 Pac. 39.]

WATERS AND WATER COURSES—CONVEYANCES.

1. A parol sale of land and appurtenant water rights for a consideration, and a surrender of possession thereof to the purchaser, creates an equitable estate in the water rights, which a court of equity is bound to protect.

INJUNCTION—RIGHTS IN PROPERTY PROTECTED.

2. One in possession of land under an equitable title can maintain a suit for an injunction for the protection of his possessory rights.

SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE.

3. Possession of premises by the purchaser in connection with full payment of the purchase money is sufficient to entitle him to specific performance.

EQUITY—JURISDICTION.

4. A court of equity is bound to protect an equitable, as well as a legal, estate.

WATERS AND WATER COURSES—APPROPRIATION—ACTIONS TO PROTECT RIGHTS.

5. A court of equity will grant an injunction to protect a water right appurtenant to land held under an equitable title.

SAME—ABANDONMENT.

6. A parol sale of land, the title to which has passed out of the government, and appurtenant water rights, for a consideration, and a surrender of the possession thereof to the purchaser to whom a conveyance is to be executed, is not an abandonment of the vendor's water rights.

SAME.

7. A transaction which fails as a sale cannot be converted into an abandonment. There is no such thing as an abandonment to a particular person or for a consideration.

ABANDONMENT—INTENT.

8. To constitute an "abandonment" of property there must be an intent to abandon, which may be inferred from acts and declarations.

WATERS AND WATER COURSES—CONVEYANCES.

9. In the absence of proof to the contrary, it will be presumed that water rights indefinitely described in a transfer as "any water right belonging to" a certain irrigation ditch, are either rights reserved by the grantor in a prior transfer of particularly described rights or new rights initiated by him, and, if he has abandoned such rights before making the subsequent transfer, it conveys nothing.

SAME—ACTIONS TO PROTECT RIGHTS—EVIDENCE.

10. In an action for an injunction to protect water rights, evidence considered, and *held* sufficient to establish a prior appropriation by plaintiffs.

SAME—APPROPRIATION—PRESCRIPTION.

11. A prescriptive right to the use of water is not acquired by taking water with the permission of the owner of the superior right.

SAME—NOTICE OF RIGHTS INVADED.

12. No adverse user of a water right can be initiated until the owner of the superior right is deprived of the benefit of its use in such a substantial manner as to notify him that his rights are invaded.

ACTION TO PROTECT RIGHTS—DEFENSES.
13. A claim of title to a water right by adverse user is inconsistent with the defense by the claimant that his use results in no injury to a superior appropriator seeking to enjoin such use.

From Josephine: HIERO K. HANNA, Judge.

Statement by MR. COMMISSIONER SLATER.

This suit was brought by plaintiffs for the purpose of protecting, by injunction, their alleged prior right to the use, for irrigation, of 260 inches of the waters of Williams Creek, in Josephine County, diverted from the west or left bank of the stream, against the alleged adverse and superior claims of the defendants to the use of 50 inches of the waters of the same stream diverted from the east or right bank, a few rods above the head of plaintiff's ditch.

Plaintiffs allege an appropriation by their predecessors in interest in 1853 of 1,000 inches of water for milling and irrigation purposes, which amount was diverted and appropriated to such use down to 1883, and that they have succeeded to those rights and since 1883 have used 260 inches for irrigating their own lands and the lands of three persons to whom they have sold water; that defendants have wrongfully interrupted their use of that amount of water, to their irreparable damage.

After denying the allegations of the complaint, defendants set up three separate and affirmative defenses. In the first they base their right upon purchase from one J. T. Layton, from whom plaintiffs also derive their right; in the second, upon prior appropriation made in 1879 by themselves and their predecessors in interest; and, in the third, upon adverse user.

By the reply all the new matter of the answer is denied. The cause was referred for the taking of testimony, and, upon a report thereof to the court, findings were made in plaintiff's favor and a decree entered, giving to them a prior right to the extent of 260 inches of

water and enjoining defendants from interfering therewith, from which decree defendants appeal.

AFFIRMED.

For appellant there was a brief over the names of *Mr. George W. Colvig* and *Mr. William P. Lord,* with an oral argument by *Mr. Colvig.*

For respondent there was a brief and an oral argument by *Mr. H. D. Norton.*

Opinion by MR. COMMISSIONER SLATER.

The main issue between the parties is the priority of their respective rights. In 1858, Simon Messenger and J. C. Duncan entered upon the southwest quarter of section 12, township 38 south, range 5 west, then vacant and unappropriated lands of the United States, in Josephine County, through which Williams Creek runs in a northeasterly direction. Near the left or west bank of the stream they erected a sawmill, and appropriated and used 1,000 inches of water from the creek to operate their mill, and incidentally, in a small way, for irrigation of adjacent lands. The head of their ditch intersected the stream on the west side near the southwest corner of the section, and about one quarter of a mile above the mill. After its use at the mill, the surplus water was turned back into Williams Creek. The amount of water furnished by the stream is not definitely determined by the record. It does appear, however, that there was sufficient water during the flood season to operate the mill; but that in occasional seasons of drought it was reduced to between 250 and 300 inches. Messenger afterwards homesteaded the land upon which the mill and ditch are situated, and a patent therefor was issued in 1875, but in the meantime he had sold and conveyed his rights, and the title and possession had passed through several hands until it rested in J. T. Layton in 1876. Prior to that time, Layton had also owned and operated some placer mines a mile or more

south and east of the mill on Whiskey Creek, a tribu-
tary of Williams Creek, which flowed into the latter
below, and on the side thereof opposite to the location
of the mill. Layton had used some of the water of
Williams Creek to assist in his mining operations, which
he took from the creek by a ditch beginning on the right
bank of the stream about opposite to the place where
the tailrace of the sawmill returned the water to the
stream. The water thus diverted by Layton was not
used by him in the mining proper, but to aid in carrying
off the tailings.

1. So far as their title is based on purchase, both
parties to this suit claim through Layton. Plaintiffs
have offered parol proof of a sale in 1876 of the mill
property, and the appurtenant water rights for a val-
uable consideration by Layton to Henry Jones, their
immediate grantor; that Jones and Provolt, who was
interested with him, took possession of the property in
that year, and, claiming full ownership, operated the
mill until about the year 1883, when Jones, then claim-
ing to the the sole owner, agreed to sell to Watts, one
of the plaintiffs, the land on which the mill and water
ditch were located and the appurtenant water rights,
reserving, however, the machinery in the mill. At that
time Jones was still owing Layton a balance of the pur-
chase price of the mill amounting to $40, and on Janu-
ary 1, 1883, Watts went with Jones to Layton to learn
from the latter what rights, if any, he claimed in or to
the mill property, and to the use of the water of Williams
Creek. Watts then informed Layton that he was about
to purchase from Jones the land and water rights ap-
purtenant to the mill, with the purpose of conveying the
water from a point adjacent to the mill to his farm, for
irrigation purposes. Layton thereupon informed him
that he (Layton) had sold everything to Jones, reserv-
ing only the right to use the water of Williams Creek
through his ditch on the east side opposite the mill, or

through another ditch he contemplated digging, intending to divert the water from the stream a few rods above the headgate of the mill race for the purpose of carrying the tailings from his mine; that the only claim he had against the mill property or Jones was a balance of $40 due him on the purchase price. Thereupon Watts paid Layton for Jones the balance due and took the receipt. Layton then authorized Jones to convey the mill property and ditch to Watts, and also agreed with Watts to make him a conveyance later on, saying his wife was not then able to go to a notary to execute the deed. This Layton never did. Watts went into possession of the mill property and ditch, and in the spring of that year dug his extension ditch from the mill in a northerly direction about one mile and a half to his land and to the land of Thomas L. Knox, to whom he soon afterwards conveyed a one half interest in the ditch. The ditch was excavated to carry 250 inches of water and was used to its full capacity, until the natural flow of the stream was interrupted by defendants, whose acts are complained of in this suit.

A right to the use of 32 inches of water was conveyed by Watts to a Mrs. McDaniels for the right of way for his ditch through her lands; and the use of 16 inches to a Mrs. Payne for the same consideration; the water in each case being used for irrigation of arid land. The remainder of the water was divided equally between Watts and his coplaintiff, successor in interest to Knox. In addition to the amount claimed through the extension ditch, Watts permitted Simon Messenger to appropriate 10 inches of the water from the mill ditch, in consideration of his doing one fourth of the repair work from the latter's home to the head of the ditch. All the remainder of the 1,000 inches originally appropriated appears to have been abandoned by Watts. About the year 1876 Layton, after his sale and surrender of possession of the mill property to Jones, pro-

ceeded to dig a ditch to convey water from a point a few rods above plaintiff's dam and headgate to his mining operations, but, after digging a small portion, four to six rods, he stopped work and left the ditch uncompleted and unconnected with Williams Creek; there being about two rods between the end of the ditch and the bank of that stream. This was never completed by him. He abandoned his mining operations and asserted no further right to the use of the waters of Williams Creek under his reservation with Jones. Other parties, however, particularly one Cooper, who owned land through which Layton's new ditch passed, excavated the uncompleted portion necessary to connect it with the stream and diverted through it a small amount of water estimated by different witnesses at 20 to 25 inches, sufficient to irrigate a few acres cultivated by him for garden produce. Just when this was done the testimony is quite indefinite; but it is probable that he and one of his neighbors used that amount of water from Williams Creek through this ditch as early as 1881 or 1882. Permission or right under Layton was not claimed until the year 1887, when the defendants and their predecessors, some of whom succeeded to whatever rights Cooper initiated, obtained from Layton, for a consideration, a conveyance of this ditch and whatever water right that may have been connected therewith, but no particular right was asserted in the instrument of transfer by Layton to be connected therewith or was any way described therein as being transferred, and it was particularly stated in the instrument that Layton did not warrant that there was any right.

Defendants have objected to the admission or consideration of plaintiffs' testimony of the oral sale and transfer by Layton to Jones. The objection is that, the legal title and possession of the ditch and mill property being in Layton, after the patent was issued, the transfer of his

rights to Jones must be evidenced by deed, in order that plaintiffs may tack their use and appropriation of the water of Williams Creek on to that of their predecessors, and thereby avail themselves of the original appropriation by Messenger and Duncan in 1858, creating a priority of appropriation in them over defendants. When, however, no title by deed, but an oral sale, is shown, defendants assert it amounts to proof of abandonment by the former possessor, and that plaintiffs' rights to the water dates from 1883, when they dug the extension ditch and re-appropriated to their own use the waters previously abandoned. This theory is based upon the rule stated in the case of *Smith* v. *O'Hara,* 43 Cal. 371, where it was held that the sale of a ditch used for appropriated water must be evidenced by a deed, and that such sale cannot be proved by parol evidence. That case was an action for damages tried before a jury, and plaintiff claimed under a prior appropriator as a purchaser of a ditch used to convey water for mining purposes; but, in *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13), this court held that the rule there stated was not applicable where there was no attempt to convey a ditch separate from the possessory right to land, but only as an incident thereto, and as a part of the improvements thereon.

2. In the case at bar Layton did not attempt to sell to Jones a ditch and water right separate from the possessory right to the land on which the mill was located, but was selling his possessory rights as well as the land itself, and all things in law included therein; that is, the ditch and the water right appurtenant thereto. It is true it would require a deed to convey a legal title, but we do not understand that a legal title is a prerequisite to obtaining equitable relief by injunction against the invasion by another of the property rights, legal or equitable, of one in possession. That may be necessary to sustain an action at law.

3. The record shows that Jones went into possession in 1876, and afterwards paid the full consideration for the sale; that he used and occupied the premises until January 1, 1883, when he sold and conveyed his title by deed to Watts, one of the plaintiffs, who entered into possession and made improvements thereon. This is evidently sufficient to enable Watts to enforce specific performance against Layton and all who claim title under him with notice of plaintiffs' rights: *Sprague* v. *Jessup,* 48 Or. 211 (83 Pac. 145, 84 Pac. 802: 4 L. R. A. [N. S.] 410).

4. In other words, Jones was invested with the substantial equitable title, good against all having notice; and his continued possession and occupancy is sufficient to convey to every one notice of his equitable rights in and to the estate. Then, why is a court of equity not bound to protect this equitable title? We think it is. "The ownership of the equitable estate is regarded by equity as the real ownership, and the legal title is, as has been said, no more than the shadow always following the equitable estate, which is the substance, except where there is a purchaser for value and without notice who has the legal estate": Pomeroy's Equity, § 147. And, where the estate is purely equitable, it is exclusively cognizable by equity; and, if its existence is shown, a court of equity not only has jurisdiction, but is bound to grant every kind of remedy necessary to its complete establishment, protection and enforcement, according to its essential nature: Pomeroy's Equity, § 1339. It will readily be conceded, doubtless, by defendants, that this would be good and sufficient to establish, protect or enforce title in a court of equity to the land and the ditch, but it may be contended that it does not apply to the use and possession of the water; but we cannot make such distinction. The right to the use of the water goes with the right to the land. It is a part of one and the same estate.

5. In the case of *McDonald* v. *Bear River Co.* 13 Cal. 220, cited with approval in *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13), there was executed by the former appropriator and possessor, by his attorney in fact, an instrument, by which, for a consideration, it was attempted to transfer to McDonald all his right, title and interest in a sawmill and flouring mills and other improvements, also his pre-emption extending up and down Bear River and belonging to said mills. Because the instrument was not sealed, it was held not sufficient, as a deed, to transfer a legal title to the land. But a consideration was stated, and the vendee was put in possession and retained possession for a series of years, making valuable improvements. Referring to this state of facts, the court say:

"That such an agreement might be specifically enforced, and was a sufficient memorandum in writing to give effect to the contract, we think cannot be disputed. That, by force of such agreement and the possession taken under it, the plaintiff McDonald acquired an equitable estate in the premises, giving him a present right to its full enjoyment, we think clear, and this right, being united with a present possession, enabled him to maintain any action for an interruption of the possession or an injury to the property."

That case was an action of damages for the diversion of the water of Bear River, to the injury of the plaintiff's saw and grist mills, situated on that stream, and a judgment awarding damages was affirmed. Certainly, then, a court of equity, the peculiar province of which is to protect equitable as well as legal estates in real property, ought to grant the extraordinary power of injunction as readily to protect the one as the other.

6. Nor in our view is the contention of the defendants a sound one, that the verbal sale of Layton to Jones for a consideration and the surrender of the possession to the latter by the former constitutes an abandonment of his right of appropriation, and that Watts' rights dates from

his reappropriation thereof in 1883. As we have seen under the decision of *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13), by this court, such would not be the case if the title to the land had not passed out of the United States; but we are unable to understand why that fact should enter into or be determinative of the question of abandonment. To constitute an abandonment there must be an intent to abandon: *Dodge* v. *Marden,* 7 Or. 456. Such an intent may be inferred from the acts and declarations of the party: *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13). "Abandonment," says Mr. Chief Justice TERRY, Mr. Justice FIELD concurring, in *Stephens* v. *Mansfield,* 11 Cal. 363, "must be made by the owner, without being pressed by any duty, necessity or utility to himself; but simply because he desires no longer to possess the thing, and, further, it must be made without any desire that any other person shall acquire the same; for, if it were made for a consideration, it would be a sale or barter, and if without consideration, but with an intention that some other person should become the possessor, it would be a gift."

7. Where for any reason a transaction fails as a sale, it cannot be converted into abandonment. There is no such thing as abandonment to particular persons, or for a consideration: *McLeran* v. *Benton,* 43 Cal. 467; *Middle Creek Co.* v. *Henry,* 15 Mont. 556 (39 Pac. 1054); *Richardson* v. *McNulty,* 24 Cal. 343.

8. In the case at bar the evidence is that Layton did not intend to abandon the use of the water which he had appropriated. His acts indicate precisely the contrary intention. He sold his title for a consideration, surrendered possession, and agreed to make a proper conveyance. "But a mere failure to execute a deed in no wise justifies the inference that he intends to throw away his honest buyer's rights as well as his own. He personally, and any grantee from him with notice, would be estopped * * from asserting his rights as against his purchaser.

Why, then, should a stranger to his title be allowed a greater privilege, a stranger, too, not in privity with the United States government itself?": *McDonald* v. *Lannen,* 19 Mont. 78 (47 Pac. 648). At all events, Layton surrendered possession in 1876 to Jones, who from that time on until January 1, 1883, occupied the premises and used the water through the mill ditch for the operation of this mill either for sawing timber or for chopping mill feed. If Layton's acts amounted in law to an abandonment, as contended by defendants, then Jones' acts certainly amounted to a reappropriation of the water of Williams Creek in 1876, and this antedates any possible claim of the defendants and their predecessors in interest. With Jones' title, whether as successor in interest to Layton or as an original appropriator, plaintiffs are in privity by deed, and hence their rights under any view to be taken of the case antedates the defendants' rights.

9. Defendants, it is true, claim to be in privity with Layton, not as to the title to the land on which the mill stood, nor of the mill ditch, but in respect to a portion of his former water right that was appurtenant to the mill property. But, by his instrument of transfer of the new ditch to them, he does not profess to be conveying to them a specific part of a water right claimed by him at the head of plaintiffs' ditch or of any of those rights reserved for a specific purpose, but he conveys generally "any water right or privilege actually belonging to the same, but which water right or privilege I do not either guarantee or defend."

10. It is shown, however, that in 1876 he had recorded a notice by which he claimed and intended to appropriate 50 inches of the surplus waters of Williams Creek to be diverted on the east bank thereof at a point opposite and just below the mouth of Powells Creek. This is about the location his new ditch was intended to intersect the stream. It must be presumed, therefore, when nothing to the contrary is shown, that the water rights indefi-

nitely referred to by Layton in his conveyance to defendants as connected with the ditch transferred to them were either those reserved by him when he sold to Jones, or new rights to the surplus waters of Williams Creek, which he intended to initiate by the posting of his notice, and not a part of the water formerly used by him in operating the sawmill when he was the owner of it. However, he never completed his ditch, but abandoned it, and it remained unused for several years. No water rights ever became vested in him on account thereof. He also abandoned his mining operations and lost the rights reserved for that particular purpose when he dealt with Jones. Therefore defendants, through their conveyance from him, derived no rights to the use of the waters of Williams Creek for irrigation purposes. The evidence is competent and sufficient to establish, for the purpose of this case, a prior appropriation and superior right in plaintiffs to the amount of water claimed by them.

11. Defendants' second claim is that they have title by adverse user; but this is clearly unsupported by the evidence. They have used some water for irrigation each year since 1881 or 1882, but it was taken with the permission first of Jones and afterwards of Watts: *Curtis* v. *La Grande Water Co.* 20 Or. 34 (23 Pac. 808, 25 Pac. 378: 10 L. R. A. 484). And in two years only, 1889 and 1905, has such use by defendants and their predecessors in interest been so inimical to the enjoyment by plaintiffs of the rights claimed by them that it could be considered adverse. At all times, excepting the two years mentioned, there appears to have been afforded by the stream an amount of water ample to supply both parties the full amount claimed by them, and hence there could not have been such an invasion by defendants and their predecessors in interest of the plaintiffs' rights during all of the statutory period as to create a prescriptive title.

12. The acts by which it is sought to establish the prescriptive right must be such as to operate as an invasion

of the right of the person against whom the prescriptive right is asserted, and will give cause of action in his favor: Long, Irrigation, § 90. No adverse user can be initiated until the owners of the superior right are deprived of the benefit of its use in such a substantial manner as to notify them that their rights are being invaded: *Wimer* v. *Simmons,* 27 Or. 1 (39 Pac. 6: 50 Am. St. Rep. 685) ; *North Powder Co.* v. *Coughanour,* 34 Or. 9 (54 Pac. 223) ; *Bowman* v. *Bowman,* 35 Or. 279 (57 Pac. 546) ; *Boyce* v. *Cupper,* 37 Or. 256 (61 Pac. 642).

Moreover, in 1889, when there was a deficiency of water, plaintiffs resisted defendants' user, and, to assert their rights, tore out the dam maintained by some of these defendants and their predecessors in interest, who thereupon sought by a suit in equity to have plaintiffs enjoined from a continuance of their acts. This litigation terminated in favor of these plaintiffs and in the dismissal of the suit.

13. It is lastly urged by defendants that no injury to the rights of the plaintiffs is shown, because, they contend, the evidence shows that at and prior to the commencement of this suit plaintiffs' ditch was running full; that the stream at all times, excepting during a very dry season, has afforded an amount of water ample to supply the needs of all; that defendants, in any event, were using only the surplus waters of the stream. This contention is inconsistent with that of title by adverse user, and is based upon the evidence of the two Messengers, who live with their mother close to plaintiffs' ditch, and who testified, in defendants' behalf, to that effect. Opposed to this is the testimony of both plaintiffs, which is corroborated by other circumstances testified to by them which it was not attempted to controvert, such as that Watts' crops were being greatly damaged for want of the usual amount of water, that Mrs. Topping was allowing Watts to use a good portion of water she claimed, that defendants measured the amount of water flowing

in plaintiffs' ditch, and found it amounted to 206 inches; whereas, Watts testified that pending the trial of this suit he measured the capacity of his ditch in its narrowest place, and found that its capacity was 220 inches, and that most of the time in 1905 it was as much as 25 per cent short in the amount of water it was carrying, and that at that time the ditch needed cleaning out, and would carry from 250 to 275 inches of water. Considering that Mrs. Messenger had been just previously enjoined at the instance of these plaintiffs from interfering with their ditch and diverting water therefrom, we are of the opinion that plaintiffs' case is sufficiently clear to entitle them to the maintenance of the injunction.

The decree of the lower court should be affirmed.

AFFIRMED.