## United Mining Company v. Morton.

(Decided March 2, 1917.)

### Appeal from Livingston Circuit Court.

1.  Frauds, Statute of—Agreement to Deal in Real Estate.—An agreement to become partners in dealing in real estate leaseholds, is neither a contract to buy nor a contract to sell real estate as between the parties to it, and is not within the Statute of Frauds.
2.  Partnership—Leasehold of Real Estate.—A leasehold of real estate is personalty; and, when owned by partners, they own the leasehold as personal property and not as joint tenants of realty.
3.  Partnership—Each Partner Agent of the Other.—Each partner is the agent of the other in all matters pertaining to the partnership; and, it is an invariable consequence of the fundamental rule of partnership law that each partner has the power to contract for the firm in partnership affairs.
4.  Partnership—Partnership in Mining—Parol Agreement.—There is nothing in the nature of mining which forbids the creation of a partnership by an ordinary partnership contract which would draw to the relation of the parties the incidents of a trading partnership, and destroy the distinctions which are based upon the non-existence of the delectus personae in strict mining partnerships. The agreement may be by parol, although it necessarily required the acquisition of an interest in land, and may be implied from the acts of those sought to be charged as partners.
5.  Partnership—Partnership in Mining Lease.—Where a partnership owns mining leaseholds, which may be surrendered or forfeited for failure to operate the mine, and one partner leaves the State under circumstances that show an intention to leave the business and its control to the remaining partner, the remaining partner may surrender the leasehold and bind the partnership thereby.
6.  Frauds, Statute of—Rescission of Contract by Parol Agreement.— A mining leasehold in writing, which is required by the Statute of Frauds to be in writing, may be rescinded by a parol agreement.

C. H. WILSON, JOHN W. BLUE, JR., WHEELER & HUGHES and LYNCH, DAY & FIMPLE for appellant.

C. C. GRASSHAM, BERRY & GRASSHAM and WILLIAM MARBLE for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This suit by the appellee, Morton, against appellant, grew out of a partnership transaction between Morton and Edward Langenbach.

Late in 1899, Edward Langenbach and Arthur J. Morton, residents of Canton, Ohio, orally formed an equal partnership for the purpose of taking mineral

options and leases, and acquiring and developing min-
eral rights and holdings in Livingston and Crittenden
counties, Ky. By the terms of the partnership, Morton
agreed to go into the mineral fields of western Kentucky
and devote his whole time in prospecting, exploring, and
doing other necessary work and labor in furthering the
interests of the partnership, and Langenbach was to pay
all expenses, including the purchase price, in acquiring
the leases and in the development thereof.

Morton proceeded to Kentucky and procured quite
a number of leases, including one known as the "Mann
Mineral Lease," in Livingston county, dated May 22,
1900. It was agreed that the firm name and style should
be "Langenbach & Morton," and all the leases acquired
by Morton should be, and they were taken, to the firm.

Shortly thereafter, Langenbach and Morton organ-
ized an Ohio corporation, known as the American Lead,
Zinc & Fluor Spar Company, and to that corporation
they sold all of their mineral leases and options that
were considered of any value, except the Mann lease,
which they retained as the property of the firm. The
capital stock of the American Lead, Zinc & Fluor Spar
Company was issued to Langenbach and Morton, equally,
in exchange for the mineral rights and holdings which
they had turned over to that corporation; and, it may
now be dismissed from further mention, except to say
that for two years or more Morton gave his time and
attention to the development of the properties of that
company.

Morton had done some prospecting on the Mann
lease, sufficient to discover a vein or body of carbonate
of zinc; but before they were able to mine any of the
zinc, litigation with subsequent lessees of Mann, over
the Mann lease, was begun in the Livingston circuit
court and removed to the federal court, which was not
finally determined until June, 1910. By the final judg-
ment entered on June 9, 1910, in the federal court, the
claim of Langenbach and Morton as owners of the Mann
lease, was established.

While Morton remained in Livingston county in the
service of the American Lead, Zinc & Fluor Spar Com-
pany, he gave such assistance as was necessary in the
litigation about the Mann lease. But, long before the
litigation was terminated, he returned to Canton; and,
from there he went to Chattanooga, Tennessee, in 1908,
where he engaged in business.

In the meantime, Edward Langenbach was paying the costs of the litigation, including attorney's fees, and other necessary expenses. Morton had not only ceased to give the business any attention whatever, but had left the state.

Morton's presence being necessary in Kentucky in 1908 in connection with the litigation, Langenbach's attorney wrote Morton, at Chattanooga, requesting him to go to Paducah; whereupon, Morton notified Langenbach that he would not attend unless Langenbach would send him $50.00 for his expenses and time. Langenbach sent Morton the $50.00 requested, and Morton went to Paducah. The federal court decided the case in favor of Langenbach and Morton in April or May, 1909; but, owing to the death of C. S. Knight, one of the litigants adverse to Langenbach and Morton, it became necessary to revive the action against his heirs, and take some additional proof as to the possession of a small part of the tract, before a final judgment could be entered. On account of this delay, the final judgment was not entered until June 9, 1910. However, when the opinion in favor of Langenbach and Morton was handed down in 1909, Morton, who was then living at Chattanooga, Tenn., wrote to Langenbach at Canton, Ohio, as follows:

"I presume Mr. Grassham notified you he won the Mann suit, and gave you the particulars. If not, I will."

In 1910, however, Morton departed from Chattanooga and settled at some place in the west. He did not notify Langenbach where he was located; and Langenbach did not see him again until his reappearance in Canton in May, 1913, after an absence from Kentucky of about five years.

In the meantime, their attorneys in Kentucky had notified Langenbach that under the terms of the lease, work should be begun upon the property in order to hold it. Thereupon, Edward Langenbach undertook to develop the property and preserve the lease. In doing this he employed his brother, William Langenbach, to superintend the work. Under this employment, William Langenbach came to Kentucky and operated the mine from June, 1910, to August, 1911, during which time he mined and shipped 357¼ tons of ore, which were sold for $8,185.73. The expense, however, of mining this 357¼ tons of ore was about $12,000.00, while the other expenses, including the cost of machinery, carried

the total expense to $18,000.00, making a total loss upon this feature of the enterprise, of nearly $10,000.00. Edward Langenbach was unwilling to put any more money into the venture, and stopped operations.

In the meantime, W. H. Mann, the owner of the leased land, had sold it to C. S. Knight; and upon Knight's failure to pay the deferred payments of his purchase money, Mann enforced his vendor's lien, in 1911. At the commissioner's sale, William Langenbach bought the land, subject to the lease of Edward Langenbach and Morton.

By its terms, the Mann lease was to continue "for and during a term of ten years from the date thereof, and so long thereafter as metals, oil, or gas can be produced in paying quantities." The judgment of the federal court by which Langenbach and Morton's lease was established, extended the lease for seven years, because of the failure of Mann to give them undisputed possession during the period of litigation. The Mann lease contained this further provision:

"The second parties, their heirs or assigns, shall have the right at any time to surrender up this lease and be released from moneys due and conditions not fulfilled; then and from that time this lease and agreement shall be null and void, and be no longer binding upon either party, and the payments, which shall have been made, be held by the party of the first part as the full stipulated damages for non-fulfillment of the foregoing contract."

The lease further required Langenbach and Morton to commence operations within ninety days from the execution of the lease, or in lieu thereof they should thereafter pay rent to Mann at the rate of $100.00 per annum; otherwise, the lease was subject to forfeiture.

When Edward Langenbach decided to discontinue operating the mine after his loss of about $10,000.00, as above recited, William Langenbach, who, as the owner of the land under his purchase at the commissioner's sale had acquired all of the rights of W. H. Mann under the lease, notified his brother, Edward, that he must continue operating the mine or surrender it, under the provisions of the lease above given; whereupon Edward Langenbach declined to proceed further with the mining operations, and orally surrendered the lease to Wm. Langenbach, under the provisions thereof, above given.

Considerable stress is laid upon the claim that Edward Langenbach and Wm. Langenbach acted collusively and fraudulently in this surrender, for the purpose of defrauding Morton. Under the uncontradicted proof, however, which shows that Edward Langenbach had, in good faith, conducted the mine for about a year at a loss of about $10,000.00, he not only exercised this right in good faith, but his good judgment in discontinuing operations, cannot be questioned. Neither can the right of Wm. Langenbach to require Edward Langenbach either to continue mining operations, or surrender the lease, or pay rent, as provided by the contract, be questioned under the express provisions of the lease.

Wm. Langenbach, as the owner of the land, had the undoubted right to require the lessees to either operate the lease, pay rent, or surrender it. Edward Langenbach had, for several years during the litigation, paid rent to Mann for the purpose of keeping the lease alive; but, as the case then stood, he was not willing to incur any further loss, or further pay rent.

At this time the partnership owed Wm. Langenbach $1,500.00, as salary. It also owned certain machinery, houses and improvements upon the leasehold, valued at $4,000.00, which Edward Langenbach had paid for. By agreement between Edward and Wm. Langenbach, the machinery and improvements were sold to Wm. Langenbach for $4,000.00, which he paid by canceling his salary claim for $1,500.00, and by paying $2,500.00 in cash. In this way Wm. Langenbach became the owner of the mine and the Mann lease, in 1911.

Wm. Langenbach operated the mine upon his own account from August, 1911, to March, 1913, during which time he shipped and sold 777¼ tons of zinc for $16,486.21, at an expense of $11,437.45, making a profit of $5,048.76.

Wm. Langenbach operated the mines entirely upon his own account, and under the business name of "The Langenbach Mine." He furnished all the money and kept all of the profits. He made no accounting whatever to Edward Langenbach, and Edward furnished no part of the purchase money and received no part of the profits.

In 1913, Wm. Langenbach conceived the idea of forming a corporation to operate the mine, whereby he could bring additional capital to his assistance. Accordingly,

in February or March, 1913, Edward Rommell, of Canton, Ohio, was introduced to Wm. Langenbach, by Veyo, a stock and bond broker of Cleveland. This resulted in Edward Rommell buying a one-half interest in the mine for $12,500.00, and the formation by Edward Rommell and Wm. Langenbach of the United Mining Company, and a conveyance of the title of the mining property to that company. With the exception of one share of stock given or loaned to Edward Langenbach, and another share given or loaned to John Rommell, a brother of Edward Rommell, both for incorporation purposes, the stock of the United Mining Company was divided equally between Wm. Langenbach and Edward Rommell. Each of them also paid in the further sum of $2,500.00, for running expenses. In this way Edward Rommell's one-half interest in the United Mining Company cost him $15,000.00.

The United Mining Company operated the mine from April, 1913, until September, 1913, during which time it mined 213½ tons of zinc, at an expense of $15,053.08. This output was sold for $2,848.08, thus making a loss of $12,205.00, to the company.

In the meantime, Morton had returned from the west to Canton, Ohio, in May, 1913. He called upon Edward Langenbach and demanded a settlement, claiming to be the owner of one-half of the Mann lease; and, obtaining no satisfaction, be brought this suit in the Livingston Circuit Court on September 12, 1913, against Edward Langenbach, Wm. Langenbach, Edward Rommell, and the United Mining Company. The petition set forth the partnership between Morton and Edward Langenbach; asked for an accounting from the latter for all zinc which had been mined and sold from the mine, at any time; for a judgment dissolving the partnership, directing a sale of the leasehold, and a distribution of the assets; for an attorney's fee for bringing this action; for a judgment against Edward Langenbach, Wm. Langenbach, Edward Rommell, and the United Mining Company for $12,500.00, which he asserted was the value of his interest, as a partner, in the mineral which had been mined and sold by the defendants.

Subsequently, on March 21, 1914, Morton filed another petition, in equity, in the Livingston Circuit Court, against the United Mining Company and Edward

Langenbach, in which he set up his partnership with Edward Langenbach, and stated that Edward Langenbach was made a defendant because of his refusal to recognize the rights of Morton, and because he had confederated with and become a stockholder in the United Mining Company for the purpose of wrongfully divesting Morton of his rights in the Mann lease.

The second petition as amended also averred that Edward Rommell, Wm. Langenbach and those promoting, organizing and composing the United Mining Company, knew of Morton's rights to the mineral and mines in said property, at the time the United Mining Company accepted the deed and mined the zinc, above referred to. He asked a judgment against the United Mining Company for $12,500.00, and that it be enjoined from digging and removing any more ore, and for the appointment of a receiver; and, that the United Mining Company be adjudged to hold the minerals and mining rights for the use and benefit of Morton.

The two actions were consolidated; and the summons issued against Edward Langenbach and Wm. Langenbach having been served upon Edward Rommell, their alleged agent, the returns thereon were quashed after the hearing of evidence which showed that Edward Rommell did not represent either of the Langenbachs.

The first paragraph of the answer traversed the petition.

In a second paragraph, the defendants specifically charged that Morton had abandoned the lease as early as 1908, and did nothing thereafter; that he knew of the judgment of June 9, 1910, or could have known of it by reasonable inquiry; and, that to now allow him to set aside the surrender to the United Mining Company and claim compensation for all the ore that had been removed by Edward Langenbach, Wm. Langenbach and the United Mining Company without being charged with any of the expenses thereof, would be inequitable and unjust, and contrary to law.

Pending the suit, Edward Rommell sold his stock in the United Mining Company, representing a one-half interest, to Wm. Langenbach, for $7,250.00.

Upon the trial of the consolidated cases, the court entered an elaborate judgment, holding: (1) That the partnership between Edward Langenbach and Morton "was a real-estate partnership and not an ordinary

commercial partnership;'' (2) that the Mann lease was held by Edward Langenbach and Morton as joint tenants, and that neither had the right, without the consent of the other, to sell or surrender the interest of the other therein; (3) that Morton's interest therein had never been abandoned or surrendered by him, and that the surrender of the lease by Edward Langenbach to Wm. Langenbach was void as to Morton; (4) that Morton had a first lien upon the other half interest in said lease, for one-half of the value of the ore, in place, that had been removed by Edward Langenbach, Wm. Langenbach, and the United Mining Company, aggregating 1,341¼ tons, which had been sold for $4,184.71; (5) awarding a personal judgment against the United Mining Company for $664.56, that being the amount for which it had sold the 213 tons of zinc mined by it; (6) directing a sale of the lease, and further directing that out of the proceeds thereof one-half should be paid to Morton, and out of the other half he should first be paid the sum of $4,184.71, and the costs of the action; and, if anything remained it should be paid to the United Mining Company.

From that judgment the United Mining Company alone appeals.

In fixing the value of the ore, in place, that is, unmined and underground, the court did not consider any of the expenses paid out by Edward Langenbach, Wm. Langenbach and the United Mining Company for the building of the necessary shafts, buildings, and machinery, for the removal of the ore, or any of the cost of mining. It merely treated the zinc mined as if it were still, in place, in the mine; and so valued it.

While many minor questions have been made and argued upon the appeal, we think the decision of the case turns upon the application of a few elementary principles to the facts of the case, which will dispose of it upon the merits.

1. In the first place, we think it clear that the circuit court erred in holding that the partnership was not an ordinary commercial partnership, or that it was what the judgment terms, ''a real-estate partnership under which the partners, Edward Langenbach and Morton, held the Mann lease as joint tenants.''

The circuit court evidently proceeded upon the theory that inasmuch as the law required the Mann lease to be

in writing, and could be assigned only by a writing, as was held in Beckett-Iseman Oil Co. v. Backer, 165 Ky. 819, that fact took the partnership out of the category of commercial partnerships.

That theory, however, substitutes the character of the business transacted by the firm for the contract of partnership. The contract of partnership was made for the purpose of acquiring leases; and leaseholds are personalty. 32 Cyc. 668.

The contract of partnership, therefore, was not within the Statute of Frauds.

In Garth v. Davis, 120 Ky. 106, we said:

"An agreement to become partners in dealing in real estate is neither a contract to buy nor a contract to sell real-estate as between the parties to it. So far as the formation of the co-partnership is concerned, the title to real-estate is no wise affected by the making of the agreement. The terms of the agreement, the mutual undertakings by the partners as between themselves as to what each will contribute, and the interests of each in the profits of their undertaking, are matters not necessarily affected by the statute. The most numerous, and what seems to us the best-reasoned, authorities hold that such contract need not be in writing if to be begun and may end within a year, although as a fact it may not be terminated for more than a year."

Vaught v. Hogue, 32 Ky. L. R. 1061, 107 S. W. 757; and Wiedemann v. Crawford, 142 Ky. 307, are to the same effect.

The Mann lease, however, to be effective, must have been in writing, although the agreement between Edward Langenbach and Morton to buy the Mann lease as partnership property was valid, though oral merely. The distinction is clearly pointed out in Garth v. Davis, supra, and other cases.

The question as to whether the rule requiring the assignment of a mining lease to be in writing, applies to this case, will be considered later.

2. Furthermore, we think the judgment is erroneous in its second proposition, holding that the estate of Edward Langenbach and Morton in the leasehold, made them joint tenants.

Counsel for Morton seek to sustain this ruling under section 2366A of the Kentucky Statutes, declaring that the possession of the surface of land shall be deemed

the possession of the mineral interests therein for the protection of the owners of the minerals. But this statute makes no change in the character of the estate of the owners of a mining lease; it merely protects them. The leasehold remained personalty, notwithstanding the statute.

3. The question next presented is this: What power did Edward Langenbach, as partner have, with respect to a surrender of the leasehold? If he was merely a joint tenant of realty, in the ordinary sense, the judgment of the circuit court might easily be sustained. If, however, he was a partner in a commercial partnership, as we conclude he was, his control over the partnership property was radically different.

With respect to both their creation and the powers of the individual members or owners, partnerships differ from co-tenancies, radically. A partnership is always the result of an agreement or contract between the parties, while a joint tenancy need not, and in a majority of cases, perhaps, does not so arise.

Furthermore, partnerships and joint tenancies are alike, in that in each case the parties have undivided interests in the whole property held by them in co-ownership; but they differ in respect to the power of disposing of the property. A joint tenant can sell his undivided interest at pleasure, but he cannot dispose of or affect the interest of his co-tenant. A partner, on the other hand, may dispose of the entire property in the name of the partnership. Furthermore, in every partnership, each partner is the agent of the other in all matters pertaining to the partnership business. It is an invariable consequence of the fundamental rule of partnership law, that each partner has the power to contract for the firm in partnership affairs.

This principle would seem to be too elementary to require citation of authority in its support. We refer, however, to Garth v. Davis & Johnson, *supra,* wherein it was said:

"As co-partners are deemed agents for each other in the transactions of the firm (Ferguson v. Sims, 3 Ky. Law Rep. 684; Davis v. Wiley, 3 Ky. Law Rep. 315, 755; Scott v. Colmesnil, 7 J. J. Marsh. 423), a memorandum signed by a partner, or authorized by him in his name, but made for the firm, will bind the partners. . . . .

"It follows that, if either of the appellees was in fact acting for his firm in buying the lots bid in by him at the sale, and was acting in pursuance to the partnership agreement alleged, his act in that matter was the firm's act."

With the exception of the right to select one's partner, which does not exist in mining partnerships, a mining partnership is not different from an ordinary commercial partnership.

The rule is stated as follows in 27 Cyc. 757:

"A mining partnership, to which the parties do not by contract give the ordinary incidents of commercial partnerships, is distinguishable from the ordinary commercial or trading partnership in those characteristics which flow from the fact that in mining partnerships there is no *delectus personae*. Except as to the few peculiarities which depend upon this distinction, the law governing a mining partnership is not different from that applicable to an ordinary commercial partnership, and elements of the latter are common also to the former."

Again, on page 756, the same author says:

"There is nothing in the nature of mining which forbids the creation of a partnership by an ordinary partnership contract which would draw to the relation of the parties the incidents of a trading partnership, and destroy the distinctions which are based upon the non-existence of the *delectus personae* in strict mining partnerships. The agreement may be by parol, although it necessarily required the acquisition of an interest in land, and may be implied from the acts of those sought to be charged as partners."

Furthermore, the circuit court erred in holding that Morton had not abandoned the partnership business. The evidence is uncontradicted, that Morton agreed to give his whole time to the partnership; that upon the creation of the American Lead, Zinc & Fluor Spar Company he accepted employment from that company and continued in it until he left Kentucky; that upon the beginning of the litigation between the partnership and Mann's subsequent grantees over the Mann lease, Morton gave no further attention to the partnership business after he left Kentucky in 1908, except that he responded on one occasion by going to Paducah at Edward Langenbach's expense; and that from that time

forward, a period of at least five years, he paid no attention whatever to the partnership business, although his contract called for his entire time; and, he did not let Langenbach know where he was. In February, 1910, the firm's lawyers at Paducah, wrote to Edward Langenbach, asking for Morton's address, but did not get it, for the reason that none of his former associates knew it.

In our view of the case, this was a complete abandonment, by Morton, of the partnership business. He left the partnership affairs wholly in the hands of Edward Langenbach, whose principal business from this time on with respect to the Mann lease, consisted in paying attorney's fees and other costs incident to the litigation.

Except in the case of a perfect legal title to a corporeal hereditament, every right or interest in, title to, or ownership of property may be lost by abandonment. 1 C. J., p. 9. This rule applies to mining rights and privileges. Aye v. Philadelphia Co., 193 Pa. 451, 74 Am. St. Rep. 696; Wilmore Coal Co. v. Brown, 147 Fed. 943, affirmed in 153 Fed. 143, 82 C. C. A. 295; Derry v. Ross, 5 Colo. 295. See also Bay State Pet. Co. v. Penn. Lubricating Co., 121 Ky. 639. And, if one can lose his lease by abandoning it, the abandonment by one partner should certainly enable the persisting partner to surrender the lease which the other partner has abandoned.

The law upon the subject is stated in 30 Cyc. 521, as follows:

"Where a partner absconds under circumstances that show an intention to leave the business and its control to the remaining partner, or is a non-resident, or permanently absent, his co-partner being the sole manager, or abandons all intention to or control of the business, his co-partner may make a general assignment for the benefit of the firm's creditors. And according to some of the cases one partner may make such an assignment where there is a crisis in the affairs of the business and his co-partner cannot be communicated with in time to meet the emergency."

Morton testified that he did not know the litigation had been ended; but in this he is surely mistaken, since, as above stated, he wrote Edward Langenbach on May 5, 1909, from Chattanooga, that the litigation had been decided in their favor.

The law is well settled in Kentucky that no one will be permitted to acquire and hold leases without development, where the payment of a royalty upon the ore produced is provided for in the terms of the lease. Eastern Kentucky M. & T. Co. v. Swann-Day Lumber Co., 148 Ky. 82, 46 L. R. A. (N. S.) 673; Killebrew, &c. v. Murray, 151 Ky. 345; Soaper v. King, 167 Ky. 121.

It was, therefore, incumbent upon Langenbach and Morton to either operate the mine, or pay rent, in order to hold the lease. This, however, Morton did not attempt or propose to do; on the contrary, he abandoned the entire business and left the state, without notifying Langenbach of his whereabouts. Under Morton's theory of the case, it was Langenbach's duty to keep the lease alive for Morton's benefit. There is no proof that Edward Langenbach ever made one cent profit, at any time, during these mining operations. On the contrary, it is uncontradicted, that he lost at least $10,000.00 in operating the mine, in addition to the purchase money and Morton's expenses.

Morton having thus abandoned the firm business and departed from the state, it must be conceded that Edward Langenbach, as partner, had the right to surrender the Mann lease, when he did, and, was not required to continue paying out money for the vain purpose of keeping up an unprofitable partnership. The purpose was to buy, sell, and operate leases for the joint benefit of the firm. When, therefore, it became apparent that the lease was unprofitable, he had the right to surrender it. The partners had, theretofore, sold many of their leases to the American Lead, Zinc & Fluor Spar Company, and others which were considered worthless had been surrendered. It does not appear in what manner those surrenders were made.

Only by some act of bad faith could Edward Langenbach have prejudiced the rights of Morton; and, in order to meet that legal requirement the petition charges that Edward Langenbach disposed of the lease in bad faith, and for the purpose of depriving Morton of his interest therein.

We do not give much importance to this contention in view of the proof by which it is sought to be maintained. Considerable stress has been put upon the fact that Edward and Wm. Langenbach are brothers; that they have offices in the same building, in Canton; that

they consulted with each other in making the surrender and transfer; and finally, that Edward Langenbach took part in the sale of the mine to Rommell.

These, however, are all strained constructions of ordinary facts which occur in every-day life. The Langenbach brothers were officers and employees of the Berger Manufacturing Company, in Canton, and naturally had offices in the building of that company. Furthermore, the proof clearly shows that Edward Langenbach took no part in the management of the mine after it had been taken over by Wm. Langenbach; neither did he take any part in the sale of the mine to Rommell. The proof upon these points is all one way, and needs no specific discussion.

4. It remains to consider the contention that Edward Langenbach had no right to verbally surrender the leasehold, and that the partnership could only transfer its rights under the lease, by an assignment in writing. The two propositions are, however, entirely different. While it might be readily conceded that the owner of a mining lease could not assign his rights to a stranger except by a writing, it does not follow that the lessee might not orally surrender his lease to the lessor.

Where an original written contract is within the Statute of Frauds, there is some difference of opinion as to whether it can be modified or changed by a subsequent oral executory contract. The weight of authority is to the effect that, as a general proposition, this cannot be done; but, in some jurisdictions it may be done, at least to a certain extent. And, it has been said that while such a new oral contract cannot be substituted, an absolute discharge might take place by word of mouth. Elliott on Contracts, sec. 1862.

This is upon the principle that an agreement to undo a contract which, to some extent, still remains open and incomplete, is an agreement merely incidental and subordinate to the original contract, and hence one which requires no new consideration to support it, and to which the Statute of Frauds does not so readily apply, as it does to the original contract.

It has repeatedly been so held in this state. Keeney v. Waters, 135 Ky. 525; Warden v. Bennett, 145 Ky. 325; Murray v. Boyd, 165 Ky. 625.

In Keeney v. Waters, *supra,* the court said:

"But it is insisted that the court erred in admitting evidence of the parol rescission of the written contract of sale between Troxell and Davis. While there is some conflict of authority upon the question whether or not a contract in writing, and which is required by the statute to be in writing, can be rescinded by parol agreement, this question has been decided in the affirmative by this court and by many other courts of this country. Davis v. Benedict, 4 S. W. 339; 9 Ky. Law Rep. 200; Hall v. Wright, 122 S. W. _____; Stearns v. Hall, 9 Cush. (Mass.) 31; Beach v. Covillard, 4 Cal. 315; Morrill v. Colehour, 82 Ill. 618; Howard v. Gresham, 27 Ga. 347; Long v. Hartwell, 34 N. J. Law 116; Wulschner v. Ward, 115 Ind. 219, 17 N. E. 273."

It is not contended that a mining lease has any peculiar features that take it out of the operation of this general rule. On the contrary, in Hooks v. Frost, 165 Pa. St. 239, it was held that an oil or gas lease may, in the absence of a statute requiring a writing, be surrendered by parol. To the same effect see Cochran v. Shenango National Gas Co., 23 Pittsburgh Leg. J. N. S. (Pa.) 82, and May v. Hazelwood Oil Co., 152 Pa. St. 518. Indiana has a statute requiring a written surrender. See Heller v. Dailey, 28 Ind. App. 555.

In the case at bar the lease was surrendered to the owner of the fee; it was not assigned to a stranger. If Edward Langenbach had followed Morton's example and done nothing, Wm. Langenbach, as owner of the fee, could have ended the lease, under its express provisions; and the fact that Edward Langenbach orally told Wm. Langenbach as owner to take back his lease since the partnership would not further operate the mine or pay rent, was, in effect, only what Wm. Langenbach had the right to require of the lessees

We conclude, therefore, that Morton having abandoned the partnership business, Edward Langenbach had the right to orally surrender the lease to the owner of the fee, and that the United Mining Company by its subsequent purchase acquired title to the mineral rights covered by the Mann lease.

The judgment is, therefore, reversed, with instructions to the circuit court to dismiss the petition.