## Justice v. Burgess.

(Decided May 10, 1932.)

VINSON & MILLER; C. F. SEE, Jr.; and M. S. BURNS for appellant.

WOODS, STEWART, NICKELL & SMOOT for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

This appeal requires a review of a decree determining the right of a lessor's vendee to recover of a lessee the stipulated rental payable under an oil lease on the land at the time of the obtainment of his deed.

J. W. Riley and wife, Kate Riley, in consideration of $1, executed and delivered to Ambrose Geary, in the name of William Justice, as lessee, an oil and gas lease for a term of twenty years, and so long thereafter as oil or gas was produced, or the rental was paid by the lessee, as provided in the lease, on 600 acres of land situated in Lawrence county, Ky. The lease authorized the lessee to remove, at any time, any and all property placed by him on the leased premises. It provided that:

"If gas is found in a quantity sufficient to furnish lessor's house, lessee agrees to sell the casing in the well (provided he proposes to abandon said well) at the market price, or if he removes the same to put tubing and packer in the well if lessor furnishes the same. . . . The lessee to deliver to

lessor in tanks or pipe line a royalty of one-eighth (⅛) of all oil produced and saved from the premises, and to pay for such gas well from the time the oil and gas is marketed, the sum of $50.00 each three months. . . . The lessor shall be entitled to gas free of cost for domestic use in one dwelling on said premises from any gas well thereon, so long as lessee shall operate the same. . . . Lessee agrees to drill a well on said premises by February 15, 1920, or to pay lessor at the rate of 33 1/3c per acre for each four months (and proportionally for any fraction thereon) thereafter until such well is drilled or this lease surrendered; or if a well be drilled or this lease surrendered before the end of the term for which payment has been made to lessor for delay, the unaccrued portion of said payment shall be a credit to lessee on any rental, royalty or gas well. . . . If lessee fails to begin a well on this farm or on the adjoining farm of J. W. Akers within four months from date then lessee agrees to pay the rental to lessor at the rate of 33 1/3c per acre for four months from date of this lease.''

The lease was dated October 10, 1919, and on its execution, a three-fourths interest in it was assigned by Justice to Ambrose Geary. And as a part of the same transaction, J. W. Akers executed and delivered to Geary, also in the name of William Justice, as lessee, an oil and gas lease on a 400-acre tract of land owned by him, adjoining the Riley land. At the date of the leases, William Justice lived at Louisa, Ky., and was engaged in the hotel business, and in the buying of cattle. Ambrose Geary lived at Lexington, Ky., and was engaged in the business of oil operator. Justice, Geary, and Ben Hardin were instrumental in obtaining the leases on the land of Riley and Akers. Riley explained the procurement of the leases in this language:

"Geary handled the leases when they were drawn up. When we signed the leases . . . we did not know that Justice had any interest; we knew that Geary represented himself as an oil operator from Lexington; that he had made some developments and that some had made good. . . . He was taking the leases in Justice's name and that was the first we knew of Justice's interest in the leases. We did not object.''

Justice claims that Riley knew of the arrangement "in a general way and from general talk."

Riley and Akers had positive information that Ambrose Geary was to be in charge and control of the leases and the development and operation to be done thereunder.

Geary was unable to place machinery on the premises and to begin drilling within the time fixed in the leases. By a writing dated January 27, 1920, executed and delivered by Riley and Akers to him, the time in which Geary was to get the machinery on the ground and to begin drilling was extended. In it, they agreed with him "to make no claims for rentals due in February 1920, if he could show that his machinery was being moved, but if he did not produce a railroad bill of lading showing his drilling machine was billed by the railroad to Richardson, Ky., on or before February 25, 1920, then the rental due on February 25, 1920 was to be paid immediately by him." It was therein further agreed that, on his moving the drilling machinery to the leased premises, "he was to drill a well on my (Riley's) farm or the farm of J. W. Akers." The writing carries below his signature this language: "This rig must be in Richardson on one of the farms mentioned by March 10, 1920, or rentals immediately paid on that day. I agree that first well shall be on the farm of J. W. Akers. Ambrose Geary." It was executed and delivered in duplicate, each party retaining a copy. About the 1st of March, 1920, the machinery arrived at Richardson and was immediately delivered by Geary to the farm of Akers, within about one-fourth of a mile of the line between him and Riley. A well to the depth of 1,505 feet was completed on the land of Akers in the summer of 1920, at a cost of $3,200. It produced about 60,000 feet of gas per day, but no oil. It was cased by Geary as it was drilled. When it developed gas, the casing was sold by Geary to Akers and Riley for $800. Immediately Geary went away or out of the community. Riley did not communicate with him or make any effort to do so, except he attempted through Justice to procure a surrender of the original lease. Justice proposed to him that he and his wife would execute a release, but he informed him that it would not be of any help to him unless he got a release from the people who then held the title; that it had to be released of record in the county clerk's office. It is unnecessary to determine whether the Akers and

Riley leases should be construed as one instrument and as intended by the parties to mean that the drilling of one well on either tract should terminate the lessee's liability for the payment of the rental under both leases or as independent leases governing the right of the lessors and the duty of the lessee in drilling and developing their respective leases. The sale of the casing, and the removal of the drilling machinery and all property of Geary from the Akers land, and the community in which it was situated, were by mutual consent of all interested parties; Riley neither demanded nor requested operation of his lease by Geary in accordance with his lease, or the payment of the rental, which according to the terms of the lease was then due, although he had full knowledge that Geary was in this manner abandoning both his and Akers' lease, with no intention of returning in the future and developing either of them. With the knowledge that the leases were taken by Geary in Justice's name, he aided and abetted Geary to abandon both leases by buying with Akers and paying for the casing in the Akers well. We may pause here to say that Akers thereafter by letter demanded of Geary a surrender of his lease, which was refused. Riley cannot avail himself of any benefit of Akers' demand to surrender his lease, unless he concedes both instruments should be construed as one, under the rule authorizing two or more instruments of writing executed at the same time by the same parties for the same purpose to be construed as one; in this event, the drilling of the Akers well by Geary was a compliance with both leases.

Long after Geary had abandoned the leases, Riley requested Justice to procure for him a surrender by Geary of the original, but he in no manner, at any time, intimated to Justice that he was expecting the payment of the rental, not even by Geary.

The well on the Akers land was completed in 1920; Riley's deed to Burgess was executed and delivered on August 4, 1926; during this interim of six years Riley treated the lease as imposing no obligation or liability on Justice for the stipulated rental. His actions, conduct, and statements, as well as those of Justice and Geary in relation to the lease and the obligations by virtue thereof for the payment of the rental thereunder, sufficiently show, not only an abandonment by acquiescence of all parties to the leases, but a waiver by Riley of all right to require Justice to pay the agreed

rental. It is perfectly apparent that the Riley lease was so abandoned, and that he neither demanded nor in any manner intimated to Justice that he expected of Geary or Justice more than a mere physical surrender of the original lease, or a release of record, which he believed was required to relieve formally his title. Neither a formal surrender of the original lease nor a release was necessary to effectuate an abandonment. "Abandonment" consists of an actual act of relinquishment, accompanied with the intent and purpose permanently to give up a claim and right of property. Stinnett v. Kinslow, 238 Ky. 812, 38 S. W. (2d) 920; Seaboard Oil Co. v. Com., 193 Ky. 629, 237 S. W. 48.

In United Mining Co. v. Morton, 174 Ky. 366, 192 S. W. 79, 83, it is said:

"Except in the case of a perfect legal title to a corporeal hereditament, every right or interest in, title to, or ownership of property may be lost by abandonment. 1 C. J., p. 9. This rule applies to mining rights and privileges. Aye v. Philadelphia Co., 193 Pa. 451, 44 A. 555, 74 Am. St. Rep. 696; Wilmore Coal Co. v. Brown (C. C.), 147 F. 931, 943, affirmed in 153 F. 143, 82 C. C. A. 295; Derry v. Ross, 5 Colo. 295. See also Bay State Pet. Co. v. Penn Lubricating Co., 121 Ky. 639, 87 S. W. 1102, 27 Ky. Law Rep. 1133."

See also Stinnett v. Kinslow, 238 Ky. 812, 38 S. W. (2d) 920; Duncan v. Mason, 239 Ky. 570, 39 S. W. (2d) 1006; American Wholesale Corp. v. F. & S. Oil & Gas Co., 242 Ky. 356, 46 S. W. (2d) 498; Napier v. Baker, 235 Ky. 724, 32 S. W. (2d) 49.

In Warren Oil & Gas Co. v. Gilliams, 182 Ky. 807, 207 S. W. 698, and Dix River Barytes Co. v. Pence (Ky.) 123 S. W. 263, no operations were had and no rentals were paid for a period of one year. In Monarch Oil & Gas Co. v. Hunt, 193 Ky. 315, 235 S. W. 772, one well was drilled by the lessee, but he made no further effort to drill or develop for more than one year. In Roesener v. Burdette, 208 Ky. 137, 270 S. W. 731, for a period of two years the lessee did not assert his rights under the lease nor indicate his purpose to develop the leased premises. In American Wholesale Corporation v. Davenport, supra, the lessees drilled and obtained producing wells and marketed the oil for several years, then

closed down the wells, left the premises and the equipment used in the operation and development of the leased premises from April, 1926, to June, 1927. In each of these cases, this court held the leases under the facts stated had been abandoned by the lessees.

An abandonment may be shown by the conduct of the parties (Seaboard Oil Co. v. Com., supra), or like any other fact it may be established by circumstances (Barnes v. Hulet, 34 N. D. 576, 159 N. W. 25; Groves v. Wittenberg [Tex. Civ. App.], 165 S. W. 889). A distinction clearly exists between abandonment and surrender. A surrender is the relinquishment of a thing or a property right thereto to another which is not an essential element of abandonment. See these words in Webster's New International Dictionary; St. Peter's Church v. Bragaw, 144 N. C. 126, 56 S. E. 688, 10 L. R. A. (N. S.) 633. There is a distinction between the elements of abandonment and those of estoppel. Hagan v. Gaskill, 42 N. J. Eq. 215, 6 A. 879; Reynolds v. Clowdus, 4 Ind. T. 679, 76 S. W. 277; Watts v. Spencer, 51 Or. 262, 94 P. 39. Also there is a distinction between the essential elements of estoppel and those of waiver. An estoppel proceeds from some act of the person which makes it inequitable for him to assert a claim of ownership as against another, even if there is no intention to surrender a claim or give up the ownership. "A 'waiver' is the voluntary surrender or relinquishment of a known legal right or intentionally doing an act inconsistent with claiming it." Bell County v. Minton, 239 Ky. 840, 40 S. W. (2d) 379, 382, and cases cited; U. S. Fidelity & Guaranty Co. v. Miller, 237 Ky. 43, 34 S. W. (2d) 938, 76 A. L. R. 12, and cases cited. Frequently the courts have used the words "estoppel" and "waiver" as convertible terms without observing a distinction between the two. This court has expressly rejected the theory that they are identical. Morgan v. Home Ins. Co., 216 Ky. 592, 288 S. W. 321; Limerick v. Home Ins. Co., 150 Ky. 827, 150 S. W. 978, 44 L. R. A. (N. S.) 371. In Central Life Ins. Co. v. Roberts, 165 Ky. 299, 176 S. W. 1139, the subject was thoroughly considered by this court, and the distinction between waiver and estoppel was compared and clearly made. To constitute a waiver, it was there declared it was necessary that the facts should not present the essential elements of estoppel. It is equally as well settled that a waiver once made is irrevocable, even in the absence of any consideration therefor or of any change of position

by the party in whose favor the waiver operates. Central Life Ins. Co. v. Roberts, supra; U. S. Fidelity & Guaranty Co. v. Miller, supra. It is perfectly apparent that Riley not only regarded the lease as abandoned by Geary, and that Justice was a mere nominal party to it, and not liable to him either for the development of the lease or the payment of rental therein provided for. It cannot be doubted he had the right so to do. His conversation with Burgess, which he detailed as having occurred in the clerk's office while they were engaged in writing the deed to Burgess, clearly shows that at that time Riley recognized and regarded the lease as having been abandoned by the parties to it, and that he had waived whatever right he might have had to assert or enforce his rights thereunder against Justice, and that he was not transferring it to Burgess, except technically, to clear his title. If Riley himself were here suing, considering his actions, conduct, and the circumstances with the determinative relative transactions between the parties during the six years next before the date of Burgess' deed, it cannot be doubted that it would be unconscionable and violative of the recognized principles of equity to permit him to recover of Justice the rental now sought to be recovered of him. The dominant facts show an unreasonable delay on Riley's part to do that which in law a man is obliged or in duty bound to do (Medley v. Johnson, 200 Ky. 689, 255 S. W. 532), sufficient to bring the case as to him within the equitable doctrine of laches, the elements of which are not identical with those of an estoppel or waiver. (Klineline v. Head, 205 Ky. 644, 266 S. W. 370.) Laches has often been applied by this court in many cases. Reed v. Runyan, 226 Ky. 261, 10 S. W. (2d) 824; Hatcher v. Fields, 205 Ky. 462, 266 S. W. 18. It is a question of fact to be determined by the circumstances in each case. Glock's Admr. v. Weikel, 149 Ky. 170, 147 S. W. 897.

Riley lulled Justice into a sense of security. It should be presumed that, if Riley had not so acquiesced in Geary's abandonment of the lease, and had not so positively manifested his assent to waive his right to collect the rental of him, Justice at least would have taken some steps or made some effort, while Geary was in the state of Kentucky, to have compelled him to pay at least three-fourths of the rental. Having so persistently acquiesced for a period of six consecutive years in the abandonment of the lease, Riley's actions, when

782

measured by the principles of equity, were sufficient to constitute laches. Hughes v. Wallace et al. (Ky.) 118 S. W. 324; Medley v. Johnson, 200 Ky. 689, 255 S. W. 532; Klineline v. Head, 205 Ky. 644, 266 S. W. 370.

Considering, without determining, that the assignment by Riley to Burgess of the claim for rental, alleged to be due under the lease, vested in him a right of action, it should be acceded that his right of action by virtue thereof was without prejudice to any set-off, counterclaim, or defense, which Justice had or might have asserted against Riley before his assignment to Burgess. Section 474, Ky. Stats.; section 19, Civil Code of Practice; Columbia Finance & Trust Co. v. First National Bank, 116 Ky. 369, 76 S. W. 156, 25 Ky. Law Rep. 561. This rule is coherent with the axiom that a stream cannot rise higher than its source.

It is indisputable that the right of Burgess to recover of Justice must be measured and determined by the right of Riley. Burgess detailed in his testimony a conversation which he claimed he had with Riley when making a trip with him from some point in the South. Such conversation occurred in the absence of Justice. Therefore, his defense is unaffected, and Burgess' right to recover of him is not ameliorated, thereby.

Wherefore the judgment is reversed, and cause remanded for proceedings consistent with this opinion.