## AMY A. BARNES v. WILLIAM H. HULET.

(159 N. W. 25.)

Supreme court — trial de novo in — demand for — written contract — reformation — fraud — cancelation for — title to land — possession — contract — abandonment — forfeiture — annual rental — interest in lieu of — costs.

Both parties appeal. Trial *de novo* demanded by defendant and partial

retrial by plaintiff. Reformation of a written contract and its cancelation for alleged fraud of defendant, and forfeiture for his defaults under the contract, are sought by plaintiff; defendant asks that title of the land in suit be quieted in him, on condition.

*Held:* There was no fraud practised upon plaintiff, inducing her to make the contract for sale of the land to defendant.

(2)· Possession in defendant was contemplated by the contract.

(3) There was no abandonment by defendant of the contract or premises.

(4) Plaintiff is not entitled to forfeiture.

(5) Plaintiff should not recover an annual rental of $300 and interest thereon for defendant's possession of the premises.

(6) In lieu of rental allowed by the judgment, plaintiff should recover only interest at 7 per cent per annum on the $2,100 balance due on contract from its date of deposit made with the clerk.

(7) Balance of deposit over $2,100 and interest and costs of trial less defendant's costs on this appeal, ordered returned to defendant, in whom also title is quieted to the half section in dispute.

Opinion filed August 7, 1916.

From a decree of the District Court of Ransom County, *Allen,* Judge, both parties appeal.

Modified and judgment directed.

*Curtis & Curtis,* for appellant.

When a judge trying a case without a jury has determined upon his decision in such case, he may announce his decision orally, and may call upon the attorney for the prevailing party to prepare findings in accord with such decision, or he may draft the findings himself. Howard v. Howard, 52 Kan. 469, 34 Pac. 1114; Bateman v. Blaisdell, 83 Mich. 357, 47 N. W. 223.

Findings are, as a rule, drawn by the attorney for the successful party, and if in accord with the judge's decision, are signed as of course. Boyd v. Campbell, 12 Misc. 351, 33 N. Y. Supp. 557.

The court having failed to find fraud, or to make special findings upon the question of fraud, the presumption is that if findings on such question had been asked by the losing party, they would have been denied. Hence the plaintiff-appellant is not entitled to judgment upon the ground of fraud. Farmers' Loan & T. Co. v. Canada & St. L. R. Co. 127 Ind. 250, 11 L.R.A. 740, 26 N. E. 789.

There is no proof of fraud, nor is there in fact any fraud in the

34 N. D.—37.

case, as the past history of this litigation will show.    Barnes v. Hulet, 29 N. D. 136, 150 N. W. 562; Tyler v. Shea, 4 N. D. 377, 50 Am. St. Rep. 660, 61 N. W. 468; Clopton v. Clopton, 10 N. D. 569, 88 Am. St. 749, 88 N. W. 562; Dedrick v. Charrier, 15 N. D. 515, 125 Am. St. Rep. 608, 108 N. W. 38; Martinson v. Marzolf, 14 N. D. 301, 103 N. W. 937; Plano Mfg. Co. v. Doyle, 17 N. D. 386, 17 L.R.A.(N.S.) 606, 116 N. W. 529.

Damages in this class of cases are measured as follows: "The detriment caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the obligation, with interest thereon."    Comp. Laws 1913, § 7147.

*Rourke, Kvello, & Adams,* for plaintiff-respondent.

"The rescission of a written contract may be adjudged on the application of a party aggrieved."    Comp. Laws 1913, §§ 5934, 7206.

"Actual fraud within the meaning of this chapter consists of the acts committed by the party to the contract or with his connivance with intent to deceive another party thereto, or to induce him to enter into the contract."    Comp. Laws 1913, § 5849; Dowagiac Mfg. Co. v. Mahon, 13 N. D. 517, 101 N. W. 903.

A false impression may be done by word, act, concealment, or suggestion or suppression.    Liland v. Tweto, 19 N. D. 552, 125 N. W. 1032, and authorities cited.

"A contract may be rescinded where the vendor lives at a distance, and there is concealment of material facts, coupled with misrepresentations that prevent investigation."    39 Cyc. 1287, 1289; Garr v. Alden, 139 Mich. 440, 102 N. W. 950; Lofgren v. Peterson, 54 Minn. 343, 56 N. W. 44; Grindrod v. Wolf, 38 Kan. 292, 16 Pac. 691.

The appellant abandoned the contract.    "A release in writing is not necessary to establish abandonment."    Mahon v. Leach, 11 N. D. 181, 90 N. W. 807.

"By abandoning the contract the provisions of the same are deemed waived and the contract annulled and extinguished."    Mahon v. Leach, supra; Ottow v. Friese, 20 N. D. 86, 126 N. W. 503.

Where both parties to a contract for the sale of land for a period of two years fail to take any affirmative steps to put the other in default, the contract will be considered as abandoned.    Weitzel v. Leyson 23 S.

D. 367, 121 N. W. 868; 2 Warvelle, Vend. & P. § 8, and authorities cited.

Or where one party absolutely and positively refuses to perform the conditions of the contract. Stratton v. California Land & Timber Co. 86 Cal. 353, 24 Pac. 1065; Giltner v. Rayl, 93 Iowa, 16, 61 N. W. 225; 39 Cyc. 1354, § 3.

This is an action for the rescission of a contract and the placing of the parties *in statuo quo*. Respondent is not standing on the contract, and therefore the measure of damages is not as for a mere money obligation and interest. A contract to convey does not confer the right of possession. The contract here was an executory one, and at no time was appellant entitled to the possession of the land. The purchaser was not entitled to enter and occupy, without license from the vendor. Holmes v. Schofield, 4 Blackf. 171, 29 Am. Dec. 364; Kratemayer v. Brink, 17 Ind. 509; Spencer v. Tobey, 22 Barb. 260; 2 Warvelle, Vend. & P. § 874; Gamble v. Ross, 88 Mich. 315, 50 N. W. 379; Gault v. Stormont, 51 Mich. 636, 17 N. W. 214; Druse v. Wheeler, 22 Mich. 439.

The amount which the vendor is to restore to the purchaser, is the amount of his purchase money with interest, less a reasonable rental value of the premises. Frink v. Thomas, 20 Or. 265, 12 L.R.A. 239, 25 Pac. 717.

"Upon rescission by the vendor the purchaser is to be charged with a fair rental value of the land from the time he took possession." 39 Cyc. 1304.

And where the purchaser in possession wishes to rescind, he must, as a condition, tender the rents received by him for the use of the land. 39 Cyc. 1420; Moline Plow Co. v. Bostwick, 15 N. D. 658, 109 N. W. 923; Haman v. McNickle, 82 Cal. 122, 23 Pac 272; Carter v. Walters, 91 Iowa, 727, 59 N. W. 201.

A rescission of an express contract renders the same of no force or validity so far as its enforcement, or damages for its breach, is concerned; but the implied obligation of the parties to restore everything of value remains in force, and may be enforced after rescission. Chesley v. Soo Lignite Coal Co. 19 N. D. 18, 121 N. W. 73; Golden Valley Land & Cattle Co. v. Johnstone, 21 N. D. 97, 128 N. W. 690.

Fraud was a material issue in this case, and it is reversible error

for the trial court to fail to find on a material issue arising on the trial. Hyde v. Minnesota, D. & P. R. Co. 24 S. D. 386, 123 N. W. 849; Jandt v. South, 2 Dak. 46, 47 N. W. 779; Gull River Lumber Co. v. School Dist. 1 N. D. 500, 48 N. W. 427; Security Improv. Co. v. Cass County, 9 N. D. 555, 84 N. W. 477.

The trial court's findings should be responsive to all the material issues made by the pleadings and should cover all issues. 8 Enc. Pl. & Pr. 944.

Goss, J. This is an action in equity to reform a written contract, and as reformed to have the same canceled as having been procured through fraud; and for annulment for breach thereof by the defendant; and for an accounting for rents and profits. Portions of the pleadings are set forth; 320 acres are involved. Plaintiff, a sister-in-law of defendant, is a resident of Minnesota, and not familiar with land values. On June 21, 1905, plaintiff and defendant entered into the following contract:

This agreement made and entered into the 21st day of June, 1905, by and between Amy A. Barnes of Proctor, Minnesota, party of the first part, and William H. Hulet, of Miller, North Dakota, party of the second part.

Witnesseth: That the parties of the first part, for and in consideration of the sum of ($3,000) three thousand dollars, to be paid as hereinafter specified, agrees to sell and convey to said party of the second part, by deed of quitclaim, the following described real estate, situated in the county of Ransom, and state of North Dakota; to wit, The west half of section 21 (twenty-one) township 136, N. of Range 57, West, of the fifth principal meridian, containing 320 acres, more or less according to the government survey thereof; and the said party of the second part agrees to pay therefor the said following sum of ($3,000) three thousand dollars at the time of the execution of this instrument, the sum of $900 upon the execution of this agreement, ($1000) one thousand dollars as soon as title is quieted, and balance in one year. In case the party of the second part fails to make the payments above specified, at the time herein named, the parties of the first part at their option may declare this contract void and terminated,

and any and all rights acquired by the party of the second part shall immediately cease.

It is stipulated that the conditions hereof shall extend to and be obligations upon both parties, their heirs, executors, and administrators.

Witness our hands this 21st day of June, 1905.

Amy A. Barnes.

William H. Hulet.

Signed in the presence of

    C. O. Heckle.

    A. F. Anderson.

The complaint further alleges that "by the mutual mistake of plaintiff and defendant the following portions of the agreement so made prior to the execution of said written memorandum thereof were omitted therefrom; to wit, 'that the action to quiet title should be commenced in the name of the defendant and be completed within one year at the defendant's expense;' (2) 'the mutual agreement for the payment of taxes accruing subsequent to June 21st, 1905, by the defendant;' (3) 'the mutual agreement for the payment of interest at the rate of 7 per cent on the unpaid purchase price remaining from time to time unpaid;' (4) 'payment of the balance of $1,100 within one year from the date of the signing of said agreement;' (5) that the action to quiet title was brought within one year, 'but was dismissed a short time afterwards, and then for the first time plaintiff discovered the mutual mistake in the omissions from said written agreement;' that immediately thereafter, plaintiff placed the contract in the hands of her attorneys for its reformation; that defendant has not paid the taxes subsequent to said contract, nor any interest on the unpaid portion of the purchase price, and has allowed the land to be sold for non-payment of taxes, and has not paid any further sums than $900 paid at the time of the signing of the contract, though demand has often been made therefor."

"For a second cause of action plaintiff alleges that the contract was procured from her by fraud" in the deception practised upon her before signing the contract. "That the land was worth not to exceed $10 per acre, while in fact it was worth not less than $30 per acre, as defendant well knew." That plaintiff relied upon defendant to deal fairly

582 34 NORTH DAKOTA REPORTS

with her; that when she signed the contract "she was ill and in great physical distress, all of which was well known to defendant." Plaintiff reaverred the portions of the agreement omitted from the contract, "The plaintiff further alleges that she did not discover the said fraudulent representation as to the value of said land until about the first day of March, 1911, at which time she was first informed of the dismissal of the action to quiet title."

For a third cause of action all the foregoing matters are realleged, and recovery is asked for the rents and profits for the period during which defendant has been in possession. The answer denies all these matters except the relationship, the execution and delivery of the contract, and that defendant has been in possession. This action was begun in August, 1911, and tried in December, 1912. The court found the execution and delivery of the agreement; that defendant, as part of the consideration for said contract, had agreed to pay all taxes then unpaid against and future taxes upon said land; that he would quiet title thereof, particularly against the claims of one Amos A. Gates; and that such portions of the agreement were omitted from the written contract which should be reformed to include the same. It further found that the taxes from 1900 to 1912 inclusive had not been paid by defendant, that the same amounted to $487.79 and interest; that there was due plaintiff from defendant on the original contract price, $2,100, allowing no interest, but, in lieu thereof, adjudging that defendant pay plaintiff $300 per year and interest thereon from 1906 to 1913 inclusive, judgment not having been entered until June, 1913. These rentals allowed amount to $2,400 and interest for an average period of four years at 7 per cent. A short-time foreclosure was decreed by directing payment of the aggregate sum, including costs, of $5,209.05 and interest at 7 per cent from June 2, 1913, to be paid within ninety days, or defendant's interest in said premises be canceled.

From this judgment both parties appealed. From the fact that the court failed to pass upon the question of fraud and forfeit the contract because thereof, plaintiff appeals. Plaintiff also contends that by dismissing the action to quiet title brought under the contract, the defendant abandoned the contract and its performance, and waived and forfeited all his rights under the contract. Defendant-appellant claims (1) that there is not only an absence of proof of fraud, but affirmative

proof disproving fraud or abandonment; and (2) that the court adopted the wrong measure of damages in mulcting him for $300 a year and interest thereon from the end of each respective year as for the value of the use and occupation of said premises, where, instead, it should have allowed but simple interest at 7% on the amount unpaid from June 21, 1905, which would have been a decree in plaintiff's favor for $3,423.87, instead of the amount adjudged and deposited, $5,209.05; or a surplus of $1,785.18 that defendant claims should be returned to him from said deposit with the clerk.

To summarize the claims of the two appellants: The plaintiff-appellant claims any rights of defendant to the land should be adjudged canceled and title quieted in her, and in any event the judgment entered in her favor for $5,209.05 should be affirmed.

Defendant-appellant asks that title in him be quieted against plaintiff, and that only $3,423.87 of the $5,209.05 on deposit with the clerk, less the costs of this appeal, be turned over to the plaintiff. As fraud is first considered in the briefs it will be first determined. The facts in brief are as follows: Gates, father of plaintiff and father-in-law of defendant, claims some interest in said land. He had previously had litigation with defendant's wife, see Hulet v. Northern P. R. Co. 14 N. D. 209, 103 N. W. 628, over this same land, in which an unrecorded deed was adjudged to be a transfer of title from the father to Mrs. Hulet. That for two and one half years before the contract between plaintiff and defendant was entered into, defendant had been negotiating with plaintiff looking towards purchase of this land. In the correspondence are many references to Gates, both parties assuming that an action to quiet title as against him was necessary before title of record could be had or passed on sale. Taxes for several years were unpaid, and mention is made in the letters that a tax deed would be taken; that certain testimony of defendant's wife was necessary to be taken in any action to quiet title. Defendant importuned plaintiff to sell him the land, he living near it. He had written her that real estate men had offered $3,500 for the half section. Plaintiff lived in Duluth. They visited back and forth, and shortly before this transaction defendant was in Duluth. About June 1st, 1905, plaintiff came to visit at defendant's home. That notwithstanding she alleges in her complaint that she was "ill and in great distress, all of which

was well known to the defendant," as one of the reasons for the consummation of the alleged fraud upon her, her own testimony disproves that entirely. She testifies to facts showing that she went with defendant to the county seat, ascertained the amount of taxes due, and knowingly and after deliberate consideration of matters, entered into the contract. That defendant had sent her the contract for execution before ever she came to North Dakota on this trip; that her husband had advised her against selling; that she knew the title was not in condition for an advantageous sale in that whoever bought the land would in all probability purchase a lawsuit with her father; that she herself was reluctant to engage in litigation with him, while defendant was willing to, having had litigation with him. She knew that back taxes amounting to approximately $400 would have to be paid; that the expense of litigation would be considerable; that the land was nonproductive, and that defendant desires it. She testifies that she went to Attorney Heckle at Lisbon, who filled in the contract for herself and defendant. Concerning this Heckle testifies: "I remember distinctly of reading the contract over to her; I said to her that it did not draw any interest, and asked what interest I should insert, and she said that she was selling to Hulet; that they were good friends, and that she was going to let him have it for $3,000 without interest. I remember this so distinctly because she was sitting back of me, and when I asked the question regarding interest I was obliged to turn clear around to see her. The price of the land was talked over. She said she would sell the land to Hulet for a less price than she would sell to anybody else. She did not ask me, as a business man, what the land was worth. She was in the office about one half hour, and the talk was confined entirely to the contract and the matters relating to it." In all probability this testimony is the truth. She remained at defendant's for a couple of months. One of his neighbors testifies to having talked with her while there. He says: "It was mentioned that she had sold her land to Hulet; the price was mentioned, which was, as near as I can remember, $3,000, and it seemed cheap to me, and I told her so; told her that she had sold that land quite cheap. As near as I can remember she answered, 'she couldn't use the land,—wouldn't do anything with it herself.' Witness thought the land was worth 'perhaps four or five thousand dollars.'" Plaintiff denies talking with this witness about the price of the land, but admits having seen him at defendant's place. In reply to a ques-

tion as to what was said in Heckle's office about interest, answers, "I cannot answer that question because I don't remember anything said about interest." A letter from Heckle to her, and her answer, are in evidence, but do not change the fact. She testifies going to the courthouse at Lisbon, that they talked over the probable outcome of an action with Gates. She says, "Well, if I signed the contract, he agreed to pay $1,000 down, and I signed. He said that he would start an action to quiet title in a very short time, and I thought it would take place when the next court met. He said 'I don't think I will have much trouble.' He says, 'Gates may sign it, he may deliver the deed without any trouble' and—I can't recall much more."

Q. After you got to Lisbon what was said between you and Hulet relative to the contract, or the terms or conditions that should be in the contract?

A. There was nothing new came up; the conversation was almost the same; that he would start proceedings to quiet title and that he would pay up the taxes, and that he thought he would have everything straightened out in a year, and that he would pay me the balance in a year, as the contract called for.

Q. And at the courthouse, what was said between you and Hulet in regard to it?

A. We simply looked up the records in regard to the taxes; I don't think we mentioned the matter of the contract at the courthouse—we went there to look up about the taxes.

Q. Your main object in going to the courthouse was to be satisfied of the fact that your father had a tax title deed of this land, wasn't it?

A. That was one of the things; and I wanted to be satisfied about the amount of taxes against the land.

Q. In looking up the taxes you discovered that your father had a tax title to this land dated March 12, 1897, didn't you?

A. March 12, 1897, Yes, sir.

Q. Prior to that time you say you had never paid any taxes on that land?

A. No, I never paid a dollar taxes.

Q. From that day to this?

A. No sir.

Fraud in the dismissal of the action, one of the causes of fraud alleged therein, concerning which she alleges in her complaint that she did not learn that the action was dismissed until a short time after its dismissal in February, "and then for the first time discovered the mutual mistakes in said written memorandum of agreement," and statements therein that she did not discover the fraudulent representation as to the value of said land "until about the first of March, 1911, at which time she was first informed of the dismissal of the action to quiet title," are disproven by her own testimony. Under this allegation it became material to know when she learned of the dismissal of the action, as she dates therefrom a contention of abandonment of the contract on that date, and also her discovery of fraud as to representation of value of the land, made to her nearly six years before this, before entering into the contract.

As to this she testifies:
Q. When did you first get notice that that action had been dismissed?
A. Well—
Q. Did you ever get notice or information?
A. No sir, I didn't.

These portions of the complaint were then read to her and she tried to evade direct answer and finally stated that, "well my father told me several years ago."

Q. How long ago?
A. Well, it must have been a year or a year and a half ago.

It seems that another brother-in-law and her father, "two or three years after the contract was signed," had laughed at her and said "she had almost given that land away; that it was worth $30 an acre." Concerning the statement in her complaint as to her being "ill and in great physical distress," she was asked, "That sickness related to the time prior to the signing of the contract?" to which she answered "No, afterward," and when asked "why that clause was inserted in that complaint," she says, "Well it is simply a mistake as to the time." She was also asked, "About what time was it when you discovered that

Hulet's representations as to the value of your land were false?" to which she replied, "Why, when my brother-in-law at Duluth told me a year or so afterwards;" and then when confronted with the statement of her complaint alleging that she first discovered it "about the first of March, 1911," she attempts another explanation and brings in her father again, about three years after the contract was signed; and when asked why she did not then commence an action to cancel the contract, gives as her excuse, "I didn't wish to excite Mrs. Hulet who was out of her mind." Again she places the time when she first discovers the fraud as "about four or five years after the contract was signed."

These excerpts fairly illustrate the unreliability of plaintiff's testimony, as well as disprove many important and basic allegations of her own complaint. And from the fact that her father is claimed as a justification for nonpayment of taxes and for her failure to earlier discover the alleged fraud upon her, and mentioned in other matters in correspondence, it is but a fair inference that defendant is correct in his claim in the brief that the father is largely instrumental, if not the moving power, in having this suit brought.

In correspondence in 1909 and later, defendant tells plaintiff of arrangements he has made to get her the money if she will but get an assignment of her father's interests in order that he may close loans and pay her off. It appears also that the testimony of Mrs. Hulet was thought very necessary in the action to quiet title against her father, and that she became insane and was so adjudged November 30, 1912, and taken to the State Asylum for insane. That she had had spells of despondency from 1904 on, evidently gradually getting worse and finally losing her mind altogether. Three or four years before 1912 she had been at a sanatarium. Many insane acts on her part are related, sufficient to show that not long after this contract was made she became mentally unbalanced. This and the supposed necessity for her testimony are assigned as the reason why the action to quiet title against Gates, and begun within a year after the contract was entered into, was not prosecuted to judgment, but instead was finally dismissed in 1911. This is corroborated by correspondence in evidence tending to establish good faith on defendant's part. The correspondence discloses that the wife's trouble took much of the husband's means, to the knowledge of the plaintiff, and is probably a reason why payment was

not enforced or earlier attempted of the contract. So far as the value of the land is concerned, the testimony is somewhat in conflict as to prices at that time, ranging from twelve to twenty dollars per acre. But the land was probably worth around $4,800, or $15 per acre. Defendant agreed to pay therefor $3,000, take up $400 in back taxes, and prosecute an action to quiet title against the father-in-law, all of which might make the value agreed to be paid more adequate than would seem at first impression. And plaintiff, understanding all this, entered into the contract with reference to it, under her declared willingness to sell it to Hulet "for a less price than she would sell it to anybody else." There is nothing substantial upon which to found a finding of fraud in procuring the contract, nor is there any evidence of abandonment of the contract by defendant. He was in possession. He had paid $900 down. He assumed that plaintiff would not enforce cancelation, and she did not, and matters drifted. "Abandonment of property necessarily involves an act by which the possession is relinquished, and this must be a clear and unmistakable affirmative act, indicating a purpose to repudiate the ownership. . . . The act of relinquishment of possession or enjoyment must be accompanied by an intent to part permanently with the right to the thing, otherwise there is no abandonment." 1 R. C. L. 4. True he did not pay taxes; that was probably intended to be left to settlement at the conclusion of the pending action against his father-in-law. Nor would the fact that he had procured a tax deed to be taken out in the name of Mrs. Hulet, after the execution of this contract and before commencement of this suit, change the situation as between these parties, as Hulet was paying taxes he had agreed to pay, and the deed as against plaintiff was void. "The purchaser under such circumstances acquires no title by his purchase, and it is deemed to be only one method of paying taxes." Stiles v. Granger, 17 N. D. 502, 117 N. W. 777.

Appellant's brief does not challenge the court's findings that the written agreement was entered into with the additional understanding that defendant should pay taxes prior as well as subsequent to the date of the contract, though the complaint only claims reformation for taxes subsequently paid; nor that there was due on the contract the sum of $2,100 in addition to claims for taxes. But defendant does assert that

plaintiff should not recover as for the use and possession, but instead should have legal interest upon the debt due under the contract.

This court agrees with this contention. Plaintiff's theory is based upon her assertion in the brief that the contract as drawn and performed did not entitle defendant to possession of said premises. But the parties under the proof dealt with reference to possession. Defendant took possession. Plaintiff has never during these six years asserted any right to possession, but has permitted defendant to enjoy it and use the premises under the belief that although the contract was silent thereon, the land was to all intents and purposes his. One can scarcely believe that he paid $900 down, unless he was to receive immediate possession. The contract in this particular should be reformed to stipulate possession to defendant from and after its date. While perhaps a court of equity might be justified in a proper case to award such a judgment as here decreed, this is not such an instance. It is inequitable, and a total disregard of contract provisions in the absence of fraud, to practically double in this way the contract price for this land. The contract should be respected, reformed, and enforced as made. It is true the plaintiff may have intended to charge no interest, as she stated to Heckle, but defendant defaulted in payments, and under the circumstances interest should be charged at least from default. And defendant offers to pay interest from date of contract, an equitable offer.

The judgment appealed from and the findings upon which it is based should be modified so as to award the plaintiff, in lieu of any provision for $300 rental per annum and interest thereon, only the balance remaining due on the contract, $2,100, with interest at 7 per cent per annum, from June 21st, 1905, to August 9th, 1913, with costs of trial, all amounting to $3,423.87 (since which last date any amount due has been on deposit with the clerk and subject to order of the court and the plaintiff); and the decree should adjudge that the clerk deliver to plaintiff said $3,423.87, less the taxable costs of the defendant-appellant on this appeal; and then return to defendant the balance of the $5,209.-05 deposit remaining, and that defendant then be entitled to judgment quieting title in him to the land, as against the plaintiff.

Judgment is directed to be entered accordingly.