Syverin OLSON, Plaintiff and Appellant,

v.

Melvin BRODELL, Jerry Brodell, and Marvin
Waldo, Defendants and Respondents.

Syverin OLSON, Plaintiff and Respondent,

v.

Jerry BRODELL, Defendant and Appellant.

No. 8116.

Supreme Court of North Dakota.

April 21, 1964.

Rehearing Denied May 22, 1964.

Stokes, Vaaler, Gillig & Warcup, Grand Forks, for plaintiff and appellant.

Duffy & Haugland, Devils Lake, for defendants and respondents and for defendant and appellant Jerry Brodell.

ERICKSTAD, Judge.

This case involves two appeals. The first appeal is from a judgment ordered by the District Court of Eddy County, dismissing the plaintiff's action of forcible entry and detainer. In his appeal the plaintiff demands a trial de novo. In the second appeal the defendant Jerry Brodell appeals from an order of the district court appointing a receiver to manage the real estate involved, pending the determination of the first appeal.

The facts will be stated in chronological order as far as possible.

In November of 1956 the plaintiff, Syverin Olson, purchased a tract of land located in Eddy County, North Dakota, consisting of approximately 2,000 acres, at a price of $35,000. This property was purchased from the father of the defendant Melvin Brodell. At the time of the purchase the plaintiff leased "one-half interest of operation and income of" the property to the defendant Melvin Brodell at a cash rental of $1,150 per year. This lease was dated November 1, 1956.

The same parties also entered into an instrument entitled "Option to Purchase." The pertinent parts of the option, omitting the description of the property, read as follows:

"(Option to Purchase)

"Syverin Olson, Max, North Dakota hereby grants and gives an option to Melvin Brodell, Warwick, North Dakota to purchase one-half (½) interest and equity in the following described land for a consideration of $17500.00. Purchase may be made at any time during a five year period and to terminate October 1st., 1961, and option shall be cancelled at that time.

"Terms of purchase through option shall be as follows:

"$1000.00 payment each and every year, interest at 4%. All payments may be made on or before due date, and to be made each year on November 1st. Last instalment in the amount of $500.-00. All interest to be paid annually on

November 1st at 4%. All payments will be made at the Farmers & Merchants State Bank of Tolna, Tolna, North Dakota."

On full payment of the purchase price by the plaintiff, the defendant Melvin Brodell and his brothers and sister joined in conveying the property to the plaintiff by warranty deed dated November 10, 1959. No reference to the lease or the option was contained in the deed. The defendant Melvin Brodell contends that this deed was executed subsequent to the death of his father, merely to carry out the terms of the contract for deed entered into between the plaintiff and the father of the defendant Melvin Brodell.

On April 12, 1960, the plaintiff, Syverin Olson, and the defendant Melvin Brodell entered into a new lease for the years 1960 and 1961, covering all the premises, except perhaps the "soil bank land," and calling for a cash rental of $2,300 per annum.

This lease contained the following language:

"(Melvin Brodell, party of the second part, has option to buy the within described real estate upon agreement with the party of the first part, Syverin Olson, during time of this lease.)"

Prior to the first of November in the years 1960, 1961, and 1962, the defendant Melvin Brodell made payments of $1,000 plus interest to the Farmers & Merchants State Bank of Tolna, North Dakota, to be submitted to the plaintiff according to the installment payment terms of the option dated January 29, 1957; but in all three instances the plaintiff refused to accept the payments.

On November 1, 1961, the plaintiff sent the defendant Melvin Brodell notice by certified mail to quit the premises. When the defendant did not quit the premises, the plaintiff had the sheriff of Eddy County, on August 6, 1962, serve upon the three defendants in the instant case an instrument entitled "Landlord's Three Days Notice to

Quit" which was dated August 3, 1962. The plaintiff followed this notice with a complaint dated November 10, 1962, bringing an action of forcible entry and detainer seeking to evict the defendants from the premises. The defendant Melvin Brodell alleged in his answer that he was the owner of one-half interest in the land and thus was entitled to possession. The other defendants alleged that they were entitled to possession of parts of the land as lessees of Melvin Brodell, who, they said, was the owner of one-half interest in the land. The county justice concluded that these defenses raised a question of title to real estate, which deprived his court of jurisdiction. For this reason, the county justice, on demand of the defendant contained in the answer, transmitted to the district court the pleadings and papers filed with him.

At the commencement of the trial in district court the plaintiff moved to amend his complaint to ask for $4,000 in damages for the withholding of the premises during the year 1962. The court delayed making a decision on this motion until the case was tried and then denied the motion on the ground that the defendant Melvin Brodell had validly exercised his option to purchase; that, in so doing, he became a cotenant; and that, under these circumstances, the plaintiff's only recourse was an action for an accounting.

The court, in a memorandum decision dated March 20, 1963, further found that the defendant was not entitled to possession of the land but that he should be permitted to make payment in full of the purchase price of a one-half interest in the land within thirty days thereof. The time for payment was later extended to May 1, 1963.

Prior to May 1, 1963, the defendant Melvin Brodell conveyed his interest in the land to the defendant Jerry Brodell, who made payment of the balance of the purchase price, with accrued interest, by delivering said payment to the Farmers &

Merchants Bank of Tolna, North Dakota, where previous payments had been made by the defendant Melvin Brodell and retained by the bank for delivery to the plaintiff.

Because of Melvin Brodell's assignment of his interest in the land to Jerry Brodell and because of the tender by Jerry Brodell of the purchase price of the one-half interest in the land, the district court found the defendant Jerry Brodell to be the equitable owner of one-half interest in the land and that for these reasons the issue raised as to the right of the defendants to possession of the land, under the option agreement, had become moot. The court then ordered that the action be dismissed. A judgment rendered pursuant to this order was entered, and it is from this judgment that the plaintiff appealed and asked for a trial de novo.

After the appeal was taken in this case the plaintiff and appellant requested the trial court to appoint a receiver of the land involved in the first proceeding, pending the determination of the appeal. On submission upon affidavits of the order to show cause why a receiver should not be appointed, the trial court appointed a receiver.

The order, which was dated August 20, 1963, provided that the receiver should "have the power as receiver to harvest and preserve the crops raised on the land involved and further, the express power to take care of obligations incurred in connection with the seeding, cultivating and harvesting of the crops grown on the land involved."

The defendant Jerry Brodell appealed from the said order appointing the receiver.

He does not question the power of the trial court to appoint a receiver pending an appeal in a proper case but argues that this is not a proper case.

We shall consider first the contentions of the plaintiff-appellant on appeal from the judgment dismissing the plaintiff's action of forcible entry and detainer.

The first contention is that the county justice improperly certified the case to the district court. The plaintiff argues that the statute which provides for a transfer of the case from the county court to the district court when a question of title arises applies only when a question of legal title, not equitable title, is raised. It should be noted that this objection to the jurisdiction of the district court was not made in district court but was made for the first time in the Supreme Court.

As an action of this type could have been initiated in district court, the district court had jurisdiction of the subject matter. When the plaintiff appeared generally and invoked the jurisdiction of the district court to permit him to amend his complaint, the district court acquired jurisdiction over the plaintiff as a party.

"* * * 'It is a universal rule, which admits of no exception that if the court has jurisdiction of the subject-matter, a general appearance gives jurisdiction over the person.' 2 Enc.Pl. & Pr. 639. 3 Am.Jur. 803 et seq." Bryan v. Miller, 73 N.D. 487, 16 N.W. 2d 275, at 282.

In the syllabus of that case, this court said:

"7. Where a court has jurisdiction of the subject matter of an action, general appearance, without objection to jurisdiction, and the invoking of the power of the court in a matter pertaining to and directly affecting the proceedings to be had in the action, give jurisdiction of the person." Bryan v. Miller, supra.

We therefore conclude that under these circumstances the district court had jurisdiction in this case.

The second contention of the plaintiff, Syverin Olson, is that the option, as agreed to, contained no provision for installment payments and that, as the full purchase price was not tendered within the term of the option, the option has expired.

He points out that the option was dated January 29, 1957, while the testimony of both the plaintiff and the defendant Melvin Brodell is to the effect that it was prepared and signed on the date that the first lease was executed, which was November 1, 1956.

He further contends that when he signed the option, only the first paragraph of the option was typed and that, because of the lateness of the evening, he and the defendant Melvin Brodell were supposed to return to the bank at another time to complete the terms of the option; that this was not done; and, thus, that he did not agree to the terms of the option providing for payment in installments.

The parties stipulated to the introduction of a letter and photographs of the option prepared by a typewriting examiner, which, the plaintiff contends, prove that the typing of the option was not the work of a single writing of one typewriter. In this connection Mr. R. E. Engen testified as follows:

"CROSS EXAMINATION BY MR. STOKES:

"Q. Mr. Engen we are referring to Defendants' Exhibit B, that is the option to purchase instrument, was that typed by yourself?

"A. Yes, sir.

"Q. Was it typed in the presence of Mr. Olson and Mr. Brodell?

"A. Yes, sir.

"Q. While they were sitting in there?

"A. Right.

"Q. It was typed in all at one time?

"A. Right.

"Q. In other words, you put the paper in the typewriter and completed the entire instrument in the presence of both of them?

"A. May I explain that?

"Q. Yes.

"A. Both came in, Mr. Olson and Mr. Brodell, very friendly after hours and we were all agreed to the terms in the option, they asked me to type it—

"MR. STOKES: Just a minute, we move that part of his answer or statement be stricken that says they were all agreed.

"THE COURT: It will be stricken, you can state what they said and what you did.

"A. I drew the option according to their instructions, what they told me to put in there, I drew it, I completed it and signed it and I acknowledged it and they were through and it was after hours they did that.

"Q. That was on the day—you took the acknowledgment you say on the day that appears on here?

"A. Right.

"Q. The 29th of January, 1957?

"A. The 29th of January, 1957, that's right.

"Q. At the bank in Tolna?

"A. Right, uh huh.

"Q. Were you here when Mr. Olson testified?

"A. No.

"Q. But he testified that only part of it was on there at the time he signed it?

"A. May I make a statement on that?

"Q. Just answer my question.

"A. That is not true.

"Q. You didn't hear him say that, in other words, your testimony is you in their presence, you put in a piece of paper in the typewriter and typed the entire

instrument, when you completed typing it, they signed it?

"A. Right.

"Q. And then you typed the acknowledgment on it at the time you typed it?

"A. Right.

"Q. And that you signed the acknowledgment in their presence?

"A. Right."

From this testimony we could reasonably conclude that Mr. Engen was contending that he typed the option agreement from beginning to end without removing it from the typewriter until it was to be signed.

In light of this testimony let us consider the pertinent parts of the typewriting examiner's statement, which read, in part, as follows:

"The purported option that you submitted for examination some time ago is indeed a strange instrument. When the typewriting is critically examined it becomes apparent that it is not the work of a single writing of one typewriter. Instead, it was written in at least two and possibly three sessions with intervals between, and there is some possibility that it may include work of more than one typewriter.

"The words—(1) '(Option to Purchase)', (2) 'as follows:', (3) the terms of the purchase, and (4) the date to the left of the signatures, are all materially darker impressions than: (1) the first paragraph of the instrument, (2) the lengthy description of the real estate, and (3) the notarial certificate. These latter three sections, in addition to being lighter impressions, display decided filling of parts of the letters 'e' and 'a', whereas the darker impressions do not include such filling. This certainly points to the typewriting

being in a different condition and suggests a lapse of time between the typing of the parts. The typewritten execution date common to both the instrument itself and in the notarial certificate differs greatly in shade or darkness of the impression, entirely inconsistent with both having been typed on the same typewriter that day.

"The various sections of the document fail to align mechanically as would the work of a single typewriting. This affects both of [sic] their arrangement of regular six horizontal lines to the inch and in the vertical spacing where the letters of succeeding lines should fall into precise columns spaced twelve characters to the inch. These slight but significant qualities of misalignment become apparent when the transparent typewriting alignment ruled test plate is placed over the document.

"The two typewritten lines for signatures do not seem to align with the date typewritten to their left, nor do they align with the three typewritten lines immediately above them. They do appear to be in vertical alignment with the greater part of the land description. While the two lines appear to agree in their vertical alignment, the horizontal spacing between the two is not in multiples of one-sixth of an inch as is the typewritten description above. This strongly suggests that the two lines were not typewritten at the same time."

The statement of the examiner and our own careful examination of the option agreement cause us to believe that the typewriting is not the work of a single writing. The difference in the impressions of the type and the nonalignment of the type cause us to believe that the agreement, in the course of its typing, was in and out of the typewriter at least three times. If, therefore, the typist's testimony be construed to

mean that he did not take the instrument out of the typewriter during the course of typing, that testimony would be untrue.

Considering the length of time from the date of preparation of the option to the date of trial, it is, however, possible that the typist may have forgotten the details, and, thus, we cannot assume that he knowingly testified falsely.

Whether or not part of the typist's testimony was knowingly false, the testimony to the effect that the agreement as it now appears was signed by both parties before the typist, who also acted as a notary public, is corroborated by the defendant Melvin Brodell.

The testimony of the plaintiff and of the defendant Melvin Brodell as to the existence of the terms of the agreement providing for installment payments is thus in conflict.

■ Under these circumstances, where the credibility of the witnesses is to be determined, the findings of the trial court, who observed the demeanor of the witnesses and who heard them testify, is entitled to appreciable weight. Umland v. Frendberg (N.D.), 63 N.W.2d 295; Spielman v. Weber (N.D.), 118 N.W.2d 727; Higgins v. Duprat (N.D.), 120 N.W.2d 16.

■ Giving the findings of the trial court appreciable weight, we conclude that the contention of the plaintiff has not been sustained.

■ This conclusion is supported by the fact that the second lease entered into by the parties contains this clause:

"(Melvin Brodell, party of the second part, has option to buy the within described real estate upon agreement with the party of the first part, Syverin Olson, during time of this lease.)"

This language, although not an example of clarity, would seem to indicate that the option previously granted was being reserved to the defendant Melvin Brodell. It is interesting to note that the option agreement dated January 29, 1957, was recorded in the office of the Register of Deeds of Eddy County on August 29, 1957, and the new lease was executed on April 12, 1960.

■ The third contention made by the appellant is that the option agreement does not provide for possession. He states that the right of possession belongs to the owner of the title and cites the following from Corpus Juris Secundum:

"Where there is no adverse holding of land, the right of possession ordinarily follows the legal title; and as an executory contract of sale does not divest the legal title of the vendor, but merely confers on the purchaser an equitable title, as discussed supra § 106, it follows that unless the contract provides otherwise the right of possession remains in the vendor, and the purchaser does not merely by virtue of his contract of purchase acquire any right immediately to enter on, or take possession of, the property. * * *" 92 C.J.S. Vendor & Purchaser, § 284 (1955).

The case of Lee v. Schide, 69 N.D. 541, 288 N.W. 556, is cited by C.J.S. to support this rule.

The appellant concedes that the option contract itself does not give the right of possession but contends that since the option was exercised, the option became a binding contract of sale, and that it is implied in the option that the purchaser have possession. He cites the following:

"* * * The vendor may voluntarily put the purchaser into possession, or the contract of sale may confer a right of possession, either in express terms or by implication; * * *." 92 C.J.S. Vendor & Purchaser § 284 (1955).

His view is that the contract clearly contemplated that the purchaser should be in

possession under the contract of purchase for the following reasons:

1. The contract provided for payments extending over a period of eighteen years and the purchaser was required to pay interest on the unpaid purchase price.

2. The purchaser was already in possession of the property as a tenant and the lease itself provided that it was subject to the option to purchase. This could only mean that if the option were exercised, the lease would be terminated and the purchaser would continue as a purchaser in possession.

In the case of Barnes v. Hulet, 34 N.D. 576, 159 N.W. 25, this court, in its syllabus, found that "[p]ossession in defendant was contemplated by the contract," although there was no specific provision therefor. In that case, however, it should be noted that the defendant had made a nine hundred dollar down payment on a purchase price of only three thousand dollars; that he took possession on making the down payment; and that the plaintiff did nothing to contest his right to possession for six years. That case can be distinguished from this case in that in the instant case the defendant was in possession in the beginning through a lease with his father; that when the plaintiff purchased the property, the defendant remained in possession through a lease with the plaintiff; that he thereafter retained possession through a second lease with the plaintiff; and that on the termination of the second lease, the plaintiff initiated this action for unlawful entry and detainer.

■ Although the defendant is required to pay four per cent interest on the unpaid principal on a contract which could conceivably run for eighteen years, we find this insufficient to create an inference that the defendant was to have possession prior to making payment in full of the purchase price.

■ At the commencement of the action the plaintiff was entitled to possession, but prior to the entry of the judgment the defendant tendered the full purchase price and, in so doing, fully performed the contract. He thereby became entitled to share in the possession of the property as an equitable owner of an undivided one-half interest in the property.

The fourth contention of the appellant Olson is that the option agreement was terminated on November 10, 1959, when the defendant Melvin Brodell joined in a deed conveying the property in dispute to the plaintiff.

In this connection we note the argument made by the plaintiff's attorney to the trial court when a copy of the deed was offered in evidence, as follows:

"This is the situation, your Honor, as the evidence shows Mr. Olson had bought this land on contract from Chris Brodell, the father; Chris Brodell died; the estate was probated; the land, as I understand it, was set over to the children by the final decree and then when Mr. Olson completed the payment on his contract, all of the children signed a deed to carry out the contract that the father had made. That was the purpose of the deed and I think we have a right to show it, that it was not for the purpose of cancelling any option or wiping out any lease or anything like that."

■ Our view of this matter is that the reference in the second lease, which was dated April 12, 1960, to an option to buy the property indicates that both parties recognized the option of January 29, 1957, to be in effect at that time.

The fifth contention of the appellant Olson is that the court attempted to make a new contract when it found that the provisions of the contract included a prepayment clause permitting the payment of the entire purchase price.

As the contract, indicated by the option agreement, provided that the payment should be made "on or before November 1 of each year," we find that the trial court properly construed the contract to permit prepayment. See Kikindal v. Mitchell, 14 Fed.Cas. 468 (No. 7763) (C.C.D. Ind. 1841); Henry v. Lane, Tex., 128 F. 243, 252, 62 C.C.A. 625, citing Kikindal v. Mitchell.

The sixth contention made by the appellant Olson is that the option agreement is not assignable.

Our view is that when the defendant Melvin Brodell exercised his option to purchase, the option became a contract to purchase. A contract of purchase is assignable unless there is a specific provision in the contract prohibiting assignment. Semmler v. Beulah Coal Mining Co., 48 N.D. 1011, 188 N.W. 310.

The last contention of the appellant Olson is that the court erred in denying the appellant's motion to amend the complaint to include a claim for damages arising out of the defendant Melvin Brodell's possession of the premises beyond the term of the lease.

Rule 15(a) of the North Dakota Rules of Civil Procedure reads as follows:

"*Amendments.* A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the action has not been placed upon the trial calendar, he may so amend it at any time within twenty days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within ten days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders."

This rule superseded Section 2807-37 of the North Dakota Revised Code of 1943, which read as follows:

"28-0737. *Time When Amendment of Pleading May Be Permitted; Nature of Amendments Allowable.* The court, before or after judgment, in furtherance of justice, and on such terms as may be proper, may amend any pleading or proceeding by:

1. Adding or striking out the name of any party;

2. Correcting a mistake in the name of a party or a mistake in any other respect;

3. Inserting other allegations material to the cause; or

4. Conforming the pleading or proceeding to the facts proved when the amendment does not change the claim or defense substantially.

Whenever any proceeding taken by a party fails to conform in any respect to the provisions of this code, the court, in like manner and upon like terms, may permit an amendment of such pleading or proceeding so as to make it conformable thereto."

There appears to be no material difference between Rule 15(a) and the statute which it superseded.

In a case decided since the adoption of Rule 15(a), this court said:

" * * * In adopting Rule 15 in lieu of the statute we made no major change in the law with respect to the amendment of pleadings by leave of court. Our rule is the same as Rule 15(a) of the Federal Rules of Practice. It is also the holding of federal courts that the trial court is vested

with a sound discretion in granting or refusing leave to amend a pleading. Federal Practice & Procedure, Barron and Holtzoff, Rules Edition, Section 445." Watkins Company v. Vangen (N.D.), 116 N.W.2d 641, at 646.

We therefore conclude that the adoption of Rule 15(a) did not alter the long-established rule of this court that a motion to amend a pleading is addressed to the sound discretion of the trial court, and its order granting or denying such motion will not be disturbed on appeal except for an abuse of discretion.

If the appellant is entitled to damages in the instant case, he is not prejudiced by the trial court's ruling, as he may institute another action in connection therewith. Under the facts of this case we find no abuse of discretion in the trial court's denial of the motion to amend.

The judgment of dismissal of the plaintiff's action was therefore proper.

We now turn to a discussion of the appeal of the defendant Jerry Brodell from the order appointing a receiver.

In this connection we must refer to the affidavits filed with the trial court in support of and in opposition to the appointment of a receiver.

The pertinent parts of the affidavit in support of the appointment of a receiver read as follows:

"That the defendants used the land during the farming season of 1962, and appropriated to themselves all of the income from the crops, hay land and rental without regard for the interest of the plaintiff any part thereof, and since the decision of the court, has entered upon the premises, without regard, and with complete disregard for any interest of the plaintiff in the land, has farmed the same, in violation of the rights of the plaintiff, and will appropriate the proceeds for their own use, without regard for the rights or interests of the plaintiff, in and to any part of the land.

"That the defendants are all insolvent and even if the plaintiff brought action and recovered judgment against them, it would be uncollectible, and he will, unless a receiver is appointed, be deprived of his just rights and interests in said property. That the crop on said land consists of 132.7 Acres as is shown by the report of the ASCS office for Eddy County, a copy of which is hereto attached marked exhibit 'A' and by reference made a part hereof. That unless the Defendants are restrained and a Receiver appointed the plaintiff will lose the 1963 crop and suffer further damages."

The pertinent parts of the affidavit in opposition to the appointment of a receiver read as follows:

"* * * that as the owner of a one-half interest in said lands, this defendant has taken possession of approximately nine hundred acres thereof consisting of crop land, pasture and hay land, but that he has not attempted to exclude the plaintiff from using the remainder of said land and that the plaintiff is free to use the same; that the plaintiff apparently did not intend to use the land or any part thereof as, by letter dated May 8, 1963, the plaintiff's attorneys wrote the Hon. Clifford Jansonius, presiding judge; 'We are concerned about this because we have a situation where approximately 2200 acres are going to lie idle this year as a result of this litigation', and that these proceedings are apparently brought for the purpose of interfering with this defendant's use of his share of said land;

"That this defendant is not insolvent but is fully capable of answering the plaintiff for any damage the plaintiff can establish; that in addition to owning a one-half interest in the land involved in this action, subject only to a

mortgage for Five Thousand Dollars, affiant is also the owner of the Northeast Quarter, the East Half of the Northwest Quarter and the North Half of the Southeast Quarter of Section Twenty-six in Township One Hundred Fifty, North of Range Sixty-three West, subject to a mortgage for only Three Thousand Dollars; that affiant has furnished the seed and performed all the work and labor in connection with the cropping of the said land and that by reason of the fact that his cash resources were exhausted in purchasing an interest in the farm, affiant has been compelled to obtain credit for his farming operations and that he needs the crop to pay such advances and that the appointment of a Receiver will result in unnecessary expense and jeopardize the protection of the crop; that affiant is willing to render to the Court a complete accounting for all crops and income from the lands to the end that this Court may be fully informed with reference thereto."

The affidavits are in conflict on the question of solvency. The defendant Jerry Brodell admits that he has excluded the plaintiff from nine hundred acres of the land.

Two subsections of our statute relating to the appointment of a receiver seem pertinent in this case:

"32-10-01. Receiver—When appointed.—A receiver may be appointed by the court in which an action is pending, or by a judge thereof:

"1. In an action by a vendor to vacate a fraudulent purchase of property, or by a creditor to subject any property or fund to his claim, or between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund or the proceeds thereof

is probable, and when it is shown that the property or fund is in danger of being lost, removed, or materially injured;

" *   *   *

"4. After judgment, to dispose of the property according to the judgment or to preserve it during the pendency of an appeal, or in proceedings in aid of execution, when an execution has been returned unsatisfied, or when the judgment debtor refuses to apply his property in satisfaction of the judgment;

" *   *   * "   North Dakota Century Code.

In this case either or both sections could apply to permit appointment of a receiver.

In the syllabus of a case decided in 1954, involving the appointment of a receiver, this court said:

"5. A receiver may be appointed by the court in which an action is pending between parties jointly interested in property on the application of any party whose right or interest in the property or fund or proceeds thereof is probable, and when it is shown that the property or fund is in danger of being lost, removed or materially injured. Section 32–1001, Subdivision 1, NDRC 1943." Gunsch v. Gunsch (N.D.), 69 N.W.2d 739.

The facts surrounding the appointment of the receiver in this case bring it within the said rule.

In the same opinion this court further said:

"In Ingwalson v. Aney, 54 N.D. 627, 210 N.W. 498, 500, it is said:

" 'Whether in any given case a situation exists which justifies or requires the appointment of a receiver is one addressed to the sound legal discretion of the district court and its order will

not be disturbed on appeal unless clearly wrong. 2 Tardy's Smith on Receivers, 2d ed. p. 1954'. See also Dale v. Duffy, 44 N.D. 33, 176 N.W. 97, 45 Am.Jur. Receivers, Sec. 47, p. 43." Gunsch v. Gunsch, supra, 69 N.W.2d at 748.

We are agreed that it cannot be said upon the record before us that the trial court abused its discretion in appointing a receiver.

The judgment dismissing the action in unlawful entry and detainer and the order appointing a receiver are both affirmed for the reasons stated in this opinion.

MORRIS, C. J., and STRUTZ, TEIGEN and BURKE, JJ., concur.